Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
William R. Sears (Bar No. 330888)
willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Anil Makhijani (admitted *pro hac vice*)
anilmakhijani@quinnemanuel.com
Casey Adams (admitted *pro hac vice*)
caseyadams@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

Lindsay Cooper (Bar No. 287125)
lindsaycooper@quinnemanuel.com
50 California Street, Floor 22
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant TWC*
*Product and Technology LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JON HART, ALEX DANIELS, and JOSHUA DUNLAP,<br><br>               Plaintiffs,<br><br>    vs.<br><br>TWC PRODUCT AND TECHNOLOGY LLC,<br><br>               Defendant. | Case No. 4:20-cv-03842-JST (AGT)<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE EGELMAN**<br><br>The Hon. Jon S. Tigar<br><br>Trial Date:   None Set |

## NOTICE OF MOTION AND MOTION TO STRIKE AND EXCLUDE

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 6, 2022, 2020 at 2:00 p.m., or as soon thereafter as counsel may be heard, before the Honorable Jon S. Tigar, in Courtroom 6 located at 1301 Clay Street, Oakland, California 94612, Defendant TWC Product and Technology LLC ("TWC") will, and hereby does, move this Court for an order granting its Motion to Strike and Exclude the Expert Report and Testimony of Plaintiffs' expert Dr. Serge Egelman. The motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Court's files in this action, the oral argument of counsel at the hearing, and on such materials and evidence as may be presented to the Court.

## RELIEF REQUESTED

TWC requests that the Court strike and/or exclude the expert report and testimony of Dr. Serge Egelman pursuant to Federal Rule of Evidence 702, Fed. R. Civ. P. 26(a)(2)(B), Fed. R. Civ. P. 37(c)(1), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

Specifically, TWC respectfully requests that the Court strike and exclude Dr. Egelman's report and testimony in their entireties for failure to disclose either the "basis and reasons" for any of the proffered opinions or the "facts or data considered . . . in forming them" as required by Fed. R. Civ. P. 26(a)(2)(B). In addition, TWC respectfully requests that the Court exclude Dr. Egelman's opinions on the following subjects as speculative and unreliable under Daubert and Fed. R. Evid. 702:

(1) Opinions regarding effective dates of certain location prompts (Ex. A at Section 2);

(2) Opinions regarding TWC's Localytics data (Ex. A at Section 2); and

(3) Opinions regarding the expert reports of Drs. Hanssens and Snow (Ex. A at Section 3). TWC further requests that the Court strike and exclude Dr. Egelman's opinions on the following subjects pursuant to Fed. R. Civ. P. 37(c)(1) on the following grounds:

(1) Opinions regarding TWC's Localytics data (Ex. A. at Section 2) as improper rebuttal evidence pursuant to Fed. R. Civ. P. 26(a)(1)(D)(ii); and

(2) Opinions regarding effective dates of certain location prompts (Ex. A at Section 2) for failure to disclose any of the "facts or data" underlying his analysis pursuant to Fed. R. Civ. P. 26(a)(1)(D)(ii).

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ...................................................................................................3

        A.      TWC's Opening Expert Reports ...............................................................3

        B.      Dr. Egelman's Rebuttal Expert Report .....................................................5

        C.      Dr. Egelman Offers Speculative Opinions Regarding Localytics and TWC's Capabilities .....................................................................................7

        D.      Dr. Egelman's Opinions Regarding Localytics Do Not Respond To Either Dr. Hanssens Or Dr. Snow .........................................................................9

        E.      Dr. Egelman Fails To Disclose The Basis For His Opinions Regarding Disclosure Screens Shown In TWC App .................................................9

        F.      Dr. Egelman's Opinions Regarding App Disclosures Undermine Plaintiffs' Position That Certain Disclosures Were "Functionally Uniform" or "Effectively Identical"........................................................................11

III.    LEGAL STANDARD .........................................................................................12

IV.     ARGUMENT ......................................................................................................13

        A.      The Court Should Exclude Dr. Egelman's Opinions as Inherently Speculative and Unreliable Under *Daubert* and Fed. R. Evid. 702 .......13

        B.      The Court Should Exclude Egelman's Opinions for Failing to Provide the "Basis and Reasons" for His Opinions in Compliance With Fed. R. Civ. P. 26(a)(2)(B)(i)......................................................................................15

        C.      The Court Should Exclude Dr. Egelman's Opinions As Improper Rebuttal Testimony.................................................................................................16

        D.      The Court Should Exclude Dr. Egelman's Opinions For Failing To Comply With Fed. R. Civ. P. 26(a)(2)(B)(ii) and Fed. R. Evid. 702(b) ...............18

        E.      If Plaintiffs Insist That TWC's Disclosures Were "Functionally Uniform," The Court Should Exclude Dr. Egelman's Contrary Opinion ...................20

V.      CONCLUSION ...................................................................................................21

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ............................................................................................ 19

*Chamberlin v. Hartog, Baer & Hand, APC*,
  No. 19-cv-08243-JCS, 2022 WL 526157 (N.D. Cal. Feb. 22, 2022)............................ 12, 15, 16

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) ..................................................................................... 11, 13

*Cotton ex rel. McClure v. City of Eureka, Cal.*,
  860 F. Supp. 2d 999 (N.D. Cal. 2012) ....................................................................... 18

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993). ................................................................................................... 12, 20

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .................................................................................................... 12, 15

*Great W. Air, LLC v. Cirrus Design Corp.*,
  2019 WL 6529046 (D. Nev. Dec. 4, 2019) ................................................................. 18

*Grodzitsky v. Am. Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020) ...................................................................................... 12

*Holt v. Finander*,
  No. 2:15-cv-05089-MSC-KS, 2021 WL 1255418 (C.D. Cal. Feb. 9, 2021) ............... 12, 16

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*,
  340 F. Supp. 3d 934 (N.D. Cal. 2018) ........................................................................ 16

*In Re Ford*,
  2015 WL 7571772 ....................................................................................................... 14

*In Re High-Tech Emp. Antitrust Litig.*,
  No. 11–CV–02509–LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014).................... 12

*In re Silberkraus*,
  336 F.3d 864 (9th Cir. 2003) ...................................................................................... 19

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .................................................................................................... 13

*Luke v. Fam. Care & Urgent Med. Clinics*,
  323 F. App'x 496 (9th Cir. 2009)............................................................................... 15

*Montera v. Premier Nutrition Corp.*,
  No. 16-CV-06980-RS, 2022 WL 1225031 (N.D. Cal. Apr. 26, 2022) ........................ 16

*Moreno v. Los Angeles Cnty. Sheriff's Dep't*,
  No. 213CV07570CASMANX, 2015 WL 4652637 (C.D. Cal. Aug. 3, 2015)............... 13

*Poore-Rando v. United States*,
  No. C16-5094 BHS, 2017 WL 5549580 (W.D. Wash. Nov. 17, 2017)........................ 19

*Salgado by Salgado v. Gen. Motors Corp.*,
  150 F.3d 735 (7th Cir. 1998) ...................................................................................... 12

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE
EGELMAN

*Sierra Club v. Cedar Point Oil*,
  73 F.3d 546 (5th Cir. 1996) ............................................................................................ 16

*United States v. Hermanek*,
  289 F.3d 1076 (9th Cir. 2002) ........................................................................................ 13

*United States v. Rincon*,
  28 F.3d 921 (9th Cir. 1994) ............................................................................................ 19

*United States v. Ruvalcaba-Garcia*,
  923 F.3d 1183 (9th Cir. 2019) ........................................................................................ 20

*United States v. Valencia-Lopez*,
  971 F.3d 891 (9th Cir. 2020) .......................................................................................... 18

*Utne v. Home Depot U.S.A., Inc.*,
  No. 16-CV-01854-RS, 2022 WL 1443338 (N.D. Cal. May 6, 2022) ........................... 13

*Wadler v. Bio-Rad Lab'ys, Inc.*,
  No. 15-cv-02356-JCS, 2016 WL 6070530 (N.D. Cal. Oct. 17, 2016) ................... 12, 16

*Wilson v. Wal-Mart Stores, Inc.*,
  No. 2:15-CV-1791-RCJ-VCF, 2016 WL 1169456 (D. Nev. Mar. 22, 2016) ............... 18

### Rules and Statutes

Fed. R. Civ. P. 26 ........................................................................................................... 1, 12

Fed. R. Civ. P. 26(a)(1)(D)(ii) ............................................................................................ 21

Fed. R. Civ. P. 26(a)(2)(B) ......................................................................................... passim

Fed. R. Civ. P. 26(a)(2)(B)(i) ............................................................................................... 1

Fed. R. Civ. P. 26(a)(2)(B)(ii) .................................................................................. 2, 3, 18

Fed. R. Civ. P. 26(a)(2)(D)(ii) ....................................................................................... 2, 12

Fed. R. Civ. P. 37(c)(1) .............................................................................................. 12, 15

Fed. R. Evid. 702 ............................................................................................... 1, 12, 14

Fed. R. Evid. 702(a) ......................................................................................................... 20

Fed. R. Evid. 702(b) ..................................................................................................... 2, 18

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE EGELMAN

1    I.      **<u>INTRODUCTION</u>**

2          Plaintiffs' expert Dr. Serge Egelman purports to rebut the opinions of TWC's experts Drs.

3    Dominique Hanssens and Karl Snow, who conducted discrete analyses using surveys and statistical

4    analysis, respectively.  But Dr. Egelman fails to comply with even the most basic elements of Fed.

5    R. Civ. P. 26 and Fed. R. Evid. 702, makes unfounded assertions that he has already walked back

6    in deposition, and offers improper rebuttal testimony that wanders far afield of any opinions offered

7    by TWC's experts.  If there was ever a case for a federal court to exercise its gatekeeping function

8    and exclude expert testimony, it is this one.  The Court should exclude Dr. Egelman's opinions for

9    the reasons that follow.

10         ***First,*** Dr. Egelman's report is full of unfounded factual assertions and speculative critiques

11   that fall apart under even the slightest scrutiny.  Dr. Egelman levies several criticisms against Dr.

12   Snow's event studies, but in addition to being unfounded, the criticisms are completely irrelevant

13   and reveal a profound misunderstanding of Dr. Snow's opinions.  That Dr. Egelman failed to grasp

14   Dr. Snow's opinions is not surprising at all given Dr. Egelman's admission that he did not read Dr.

15   Snow's full expert report and did not even look "too closely" at the parts that he did read.  Ex. B. at

16   30:7-15.[1] Dr. Egelman also makes sweeping statements regarding what certain data fields in TWC's

17   Localytics data represent and what those fields can be used to show.  Yet when questioned about

18   those fields during his deposition, Dr. Egelman admitted that he did not review the full set of

19   Localytics data, does not "know definitively what [the data fields] represent," does not know if all

20   the fields are populated for the entire dataset, and has "no idea" what some fields even mean.  *Id.* at

21   90:8-91:4, 103:22-104:4.  Dr. Egelman further suggests that Dr. Hanssens's survey improperly

22   "primed" respondents to think about advertising by asking questions about advertising at the

23   beginning of the survey.  Ex. A at 5.  Yet in Dr. Egelman's own words, his observations are just

24

25

26    _____

27   [1] "Ex." Cites refer to exhibits to the Declaration of Stephen Broome in Support of Defendant's Motion to Exclude the Expert Report and Testimony of Serge Egelman.  "Cert Opp. Ex." Cites refer to exhibits to the Declaration of Stephen Broome in Support of Defendant's Opposition to Plaintiffs'

28   Motion for Class Certification.  Dkt. Nos. 154-4-41.

1   "speculation" because he could have tested his priming hypothesis through a survey of his own but

2   did not. Ex. B at 144:11-15. The Court should exclude these speculative and unreliable opinions.

3        **Second,** Dr. Egelman failed to comply with Fed. R. Civ. P. 26(a)(2)(B)(i), which requires

4   that an expert disclose "the basis and reasons" for his opinions. Dr. Egelman's six-page "report" is

5   devoid of citations to the record or academic authorities that form the basis for his opinions. *See*

6   Ex. A. The only sources that Dr. Egelman cites are a Wikipedia page (to explain a term in his

7   qualifications section) and a single document produced by TWC. Dr. Egelman insisted that citations

8   are unnecessary because his opinions "should be obvious" to another expert. Ex. B at 16:22-17:2.

9   TWC disagrees, but even if Dr. Egelman is correct, this *ipse dixit* falls far short of what Rule 26

10  requires.

11       **Third,** Egelman's report constitutes improper rebuttal testimony. Dr. Egelman claims

12  (without providing any factual basis) that TWC is able to use Localytics data to identify members

13  of the putative class and create user profiles—issues that Dr. Egelman admits are not addressed in

14  either Dr. Hanssens's or Dr. Snow's reports. Ex. A at 3; Ex. B at 128:16-20. Dr. Egelman's opinions

15  on class member identification and other possible uses of TWC's data cannot even charitably be

16  read as "intended solely to contradict or rebut evidence on the same subject matter identified" by

17  either of TWC's affirmative experts. Fed. R. Civ. P. 26(a)(2)(D)(ii). The Court should exclude this

18  opinion because it is little more than a belated effort to shore up Plaintiffs' class certification case

19  in a manner that violates the scheduling order and prejudices TWC by depriving it of the opportunity

20  to rebut Dr. Egelman's opinions through expert testimony of its own.

21       **Fourth,** Dr. Egelman failed to comply with Fed. R. Civ. P. 26(a)(2)(B)(ii) and Fed. R. Evid.

22  702(b), which require that an expert produce the "facts or data" they considered in forming their

23  opinions. A key aspect of Dr. Egelman's opinion is that a certain disclosure screen was displayed

24  in the TWC App during a certain time period—a conclusion which is itself contrary to the factual

25  record and the undisputed testimony of TWC's corporate representative on this topic. Dr.

26  Egelman's opinion is based on his own analysis of historical versions of the TWC App, but the files

27  Dr. Egelman claims to have analyzed have neither been produced nor made available for inspection

28  in this case, despite TWC's request. When asked about these historical app versions during his

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE
EGELMAN

1    deposition, Dr. Egelman could not remember where he accessed them, how he accessed them, what

2    versions he accessed, what steps he took to test them, or what devices or operating system versions

3    he tested them on.  Ex. B at 20:6-23, 21:1-22:19, 80:1-17.  Dr. Egelman also could not confirm

4    whether he retained the app versions or devices that he used in his testing; he recently "purg[ed]" a

5    number of things from his devices, and may have deleted the app versions he used in that process.

6    *Id*. at 59:16-23.  Because Plaintiffs failed to produce or even preserve basic information about this

7    analysis as required by Fed. R. Civ. P. 26(a)(2)(B)(ii), the Court should prevent Dr. Egelman from

8    offering any opinion or testimony stemming from this analysis.

9           ***Finally***, Dr. Egelman's opinions regarding the difference between location prompts should

10   be excluded as irrelevant and unhelpful because they fail to logically advance any material aspect

11   of Plaintiffs' case.  Plaintiffs have argued that all the prompts used by the TWC App during the class

12   period were "functionally uniform" or "effectively identical."  Dkt. 141 at 2, 12.  Indeed, this is the

13   foundation of their argument that common issues predominate in this case.  *Id*. at 13.  Yet Dr.

14   Egelman's criticisms of Dr. Snow's and Dr. Hanssens's reports are premised on the notion that those

15   *same* prompts are materially different.   In fact, Dr. Egelman expressly rejected Plaintiffs'

16   assumption that consumers will perceive these prompts as identical without performing a study to

17   evaluate the issue—a study that neither of Plaintiffs' experts performed.  The Court should exclude

18   Dr. Egelman's opinion about the relevant dates of the iOS permission prompt because it is at odds

19   with Plaintiffs' own positions and the record.

20          TWC respectfully requests that the Court grant its motion to exclude the expert report and

21   testimony of Dr. Egelman.

22   **II.    <u>BACKGROUND</u>**

23          **A.    <u>TWC's Opening Expert Reports</u>**

24          In accordance with the case schedule, the parties disclosed opening experts and exchanged

25   opening expert reports on March 4, 2022.  Dkt. 110.  TWC disclosed two experts:  (1) Dr. Karl

26   Snow, an economist and statistician who conducted event studies to analyze whether TWC App user

27   behavior changed after certain key disclosures about TWC's use of location data (Dkt. No. 154-19,

28   Cert Opp. Ex. O ¶¶ 22-25), and (2) Dr. Dominique Hanssens, a marketing professor and survey

expert who conducted surveys to analyze putative class members' awareness and understanding of TWC's use of location data for ad targeting.  Dkt. No. 154-21, Cert Opp. Ex. Q ¶¶ 16-20 (Hanssens Rept.).

Dr. Snow's event studies measured TWC App user behavior by examining data from Localytics, an analytics vendor TWC used during the class period.  Cert Opp. Ex. O ¶¶ 28-35 (Snow Rept.).  Localytics captured "session data" that recorded certain information about the TWC App and how it was used each time a user opened it on a device.  *Id.* ¶¶ 16-20.  Dr. Snow used statistical analysis of sessions data to determine whether certain metrics of user behavior—sharing location with the App, downloading the App, using the App, and uninstalling the App—changed in response to certain key "events": (1) the January 3, 2019 filing and publication of the LA City Attorney's complaint against TWC for the same conduct at issue here; (2) TWC's January 25, 2019 launch of a new location permission prompt in the iOS App that specifically disclosed TWC's use and sharing of location data; and (3) TWC's April 19, 2029 launch of a Blue Screen prompt in both the iOS and Android Apps (shown to all new *and existing* users) that specifically disclosed TWC's use and sharing of location data for advertising purposes and required users to click "I Understand" before they could proceed to use the App.  Cert Opp. Ex. O (Snow Rep.) ¶ 23. Dr. Snow's analysis shows, *inter alia*, that following these "events," there was no material change in the rate at which users shared their location data with the App, downloaded the App, used the App, or uninstalled the App. *Id.* §§ V.A-D ¶¶ 39-97.  Notably, TWC launched the prompts Dr. Snow used to measure user behavior *after* the class period.  *Id.* ¶ 23.[2]

Dr. Dominique Hanssens, Professor of Marketing at UCLA's Anderson School of Management, conducted surveys of actual TWC App users, and separately of non-TWC App users, to determine whether users were aware of how the TWC App and apps like it used their data, how they viewed such uses, and what users expected TWC to do with their data based on the App's

---

[2]  Plaintiffs have limited the class period to the day before TWC launched the January 25, 2019 prompt in recognition of the fact that that prompt discloses the information allegedly omitted from the versions in effect during the class period (namely, TWC's use and sharing of location data for advertising).  Dkt. 141 at i.

prompts during the class period.  The results of Dr. Hanssens' surveys show, *inter alia*, that users: (1) expected the free version of the App to use their location to show them targeted ads; and (2) would go to the App's privacy policy or in-App privacy settings page to learn more about its use of their data.  Cert Opp. Ex. Q (Hanssens Rep.) ¶¶ 16-20, 43-44, 51, 53.

## B.  Dr. Egelman's Rebuttal Expert Report

Dr. Egelman is a computer scientist who has been publicly linked with scrutiny of TWC's conduct since at least December 2018, when he was quoted in a *New York Times* article that criticized the privacy practices of a number of apps, including the TWC App.  Ex. B at 29:8-23; Ex. C at 6.  Dr. Egelman's entire report is only six pages long.  Ex. A at 1.  It does not include a "a complete statement of all opinions the witness will express and the basis and reasons for them," a list of "the facts or data considered by the witness in forming" those opinions, or a  "statement of the compensation to be paid for the study and testimony in the case," all of which are elements that an expert report "must contain" under Fed. R. Civ. P. 26(a)(2)(B).

Although Plaintiffs did not disclose Dr. Egelman until the deadline for rebuttal experts on May 20, 2022, Dr. Egelman does not identify himself as a rebuttal expert, nor does he specify which opinions of Dr. Hanssens or Dr. Snow he intends to rebut.  *Id*.  His report is titled simply "Expert Report."  Ex. A at 1.  In the sections of his report providing "comments" on the reports of Dr. Hanssens and Dr. Snow, Dr. Egelman does not include a single citation to either reports.  *Id*. at 4-6.  During his deposition, Dr. Egelman claimed that certain of his opinions could "contextualize" the Hanssens and Snow reports, but he could not identify a single opinion from either report to which those opinions directly respond.  *See, e.g.*, Ex. B at 127:7-12.  He further admitted that neither report offers any opinions about several of the claims he makes.  *See, e.g.*, *id*. at 128:16-20 ("Q.  [N]either Dr. Snow nor Dr. Hanssens offers any opinions about whether you can identify a certain number of unique users in a given state or region, right?  A.  Right.").

Dr. Egelman's expert report only cites a single document in the record and the only academic authority he cites is Wikipedia, which appears only in his qualifications section.  Ex. A at 1 fn.1, 4.  When asked about this lack of authority, Dr. Egelman acknowledged that it was "[m]aybe . . . a

1    failure on [his] part" but nevertheless insisted that he did not need to include citations because his

2    criticisms "should be obvious" to other experts.  Ex. B at 17:12-21.

3         Dr. Egelman purports to rebut the expert opinions of Dr. Snow, but admitted that he "didn't

4    read [Dr.] Snow's report too closely."  Ex. B at 30:7-8.  As he put it, Dr. Egelman concluded that a

5    perceived error "at the beginning of the report" was "disqualifying" and therefore it "wasn't really

6    worth the time to read the rest of the report."  *Id*. at 30:10-11, 50:18-51:3.  Dr. Egelman admits that

7    for the parts he did read, he didn't read them "too closely."  *Id.* at 30:1-15.  When pressed, Dr.

8    Egelman admitted that he did not know what Dr. Snow was analyzing, and did not "know what he

9    actually did."  *Id.* at 114:14-21 ("Q: Do you know what he's analyzing? A. No… I don't know what

10   he actually did.").  This is not surprising given that he did not read the entire report.

11        Dr. Egelman also purports to rebut the expert opinions of Dr. Hanssens, TWC's survey

12   expert.  Dr. Egelman criticizes Dr. Hanssens' survey because in his view it improperly "primed"

13   respondents to think about advertising by asking questions about advertising at the beginning of the

14   survey.  Ex. A at 4-5.  Dr. Egelman's report inaccurately states that the survey respondents

15   "specifically were asked about ads starting in the second question of the survey (the first question

16   was used for subterfuge) and then throughout."  Ex. A at 4.  In fact, the fifteen-question survey

17   asked about ads only in the twelfth and thirteenth questions.  Ex. B at 135:18-136:9; Class Cert. Ex.

18   Q (Hanssens Rep.).  Confronted with the actual survey during his deposition, Dr. Egelman was

19   forced to walk his statements back and admit that his characterization was "inarticulate."  Ex. B at

20   136:2-137:12.

21        Although priming is a key issue for Dr. Egelman, his report does not define what priming is,

22   explain whether (and if so to what extent) it had any impact on the survey, or cite any academic

23   authority on the subject.  Ex. A.  During deposition, Dr. Egelman claimed that there is "a litany" of

24   survey design textbooks that explain why priming is an issue, but he could not name a single

25   authority.  Ex. B at 142:6-14.  Dr. Egelman also admitted that his theory regarding the effects of

26   "priming" on Dr. Hanssens results (if any) could have been tested if he had conducted a survey of

27   his own, but he did not do so.  *Id.* at 138:10-22.  As a result, the most Dr. Egelman can say is that

28

priming *might* be an issue, but he can't say for sure whether or to what extent it actually impacted Dr. Hanssens' studies. *Id.* at 142:4-19.[3]

## C.     Dr. Egelman Offers Speculative Opinions Regarding Localytics and TWC's Capabilities

Dr. Egelman's report contains a page-and-a-half discussion about the Localytics session data that Dr. Snow used to conduct the analysis in his report.  Ex. A at 3-4; Class Cert Ex. O (Snow Rept.) at 17.  Dr. Egelman puts forth several opinions about what could be determined by analyzing the Localytics data, what advertising products TWC might be able to build with those data, and how those data might be used to identify putative class members or prove other aspects of Plaintiffs' claims*. Id.* at 4.  Dr. Egelman does not say whether he has ever worked with Localytics or similar platforms, and does not explain how any of his expertise qualifies him to opine on Localytics.  *Id.*

Although TWC no longer uses Localytics as a vendor and does not have access to its services, the raw data have been preserved for this litigation.  Dkt. No. 154-20, Cert Opp. Ex. P (Cyr Decl.) at ¶ 6.  TWC produced this raw Localytics data, amounting to several terabytes, to Plaintiffs nearly a year ago.  Ex. D.  This is the same data, in the same format, that Dr. Snow analyzed for his report.  To date, it is not clear whether Plaintiffs have even downloaded the full set of Localytics data.[4]  Dr. Egelman admitted that he did not have access to the full dataset when conducting his analysis.  Ex. B at 56:13-15.  Instead, he made certain assumptions about what was in the Localytics data based on representations from Plaintiffs' counsel, who may or may not have accessed it themselves.  *Id.* at 10:22-11:2, 56:13-15.  Dr. Egelman says he reviewed a "subset of [Localytics data]," but fails to identify what that "subset" was, how it was selected and by whom, or why he did

---

[3]  Dr. Egelman's report also criticizes Dr. Hanssens for using a sample of people he considers to be "tainted" because they had used the TWC App before.  Ex. A at 5.  During his deposition Dr. Egelman walked this criticism back as well, acknowledging that this purported issue was resolved by Dr. Hanssens' robustness study which asked non-TWC users about a fictitious app.  Ex. B at 156:11-13 ("Q.  And that potential source of bias is resolved in the robustness survey?  A.  That potential source of bias is resolved, yes.").

[4]  Although TWC produced the dataset to Plaintiffs more than a year ago, Plaintiffs' counsel was apparently struggling to access the data just one week before serving Dr. Egelman's report.  Ex. E at 3.  TWC promptly provided assistance, *id.* at 1, but Plaintiffs' counsel have never confirmed that they successfully downloaded the full dataset.

not access the full set of data that TWC produced to Plaintiffs. Ex. A at 3. During his deposition, Dr. Egelman confirmed that he only "skimmed" the subset he did review and concluded that he did not need to review the rest because Plaintiffs' counsel told him it was "more of the same." Ex. B at 83:17-22, 87:16-20. He was not able to say whether Localytics actually contained any precise location data associated with TWC App users (it did not, *see* Cert Opp. Ex. P ¶ 4 (Cyr Decl.)), and admitted that he could not remember which data he reviewed came from which systems. Ex. B at 86:3-4; *id.* at 86:7-9.

Despite only reviewing a fraction of the Localytics data and being uncertain about key aspects of its contents, Dr. Egelman concluded that the Localytics data provides the ability to "identify how many unique users were using TWC's App in a specified state or region at any given time." Ex. A at 4. Similarly, Dr. Egelman claims that "[t]he version of the TWC app that was first used by any given user correlates to one of the three permission prompts used over the relevant time period." *Id.* Finally, Dr. Egelman makes the sweeping claim that:

> Based on my experience and expertise, I am confident that these identifiers are linkable to other persistent identifiers collected previously (and/or from other sources) and that user profiles can be created that identify individuals' physical locations over times, their routines, relations, interactions, and their preferences and interests based on the other websites and mobile apps they use.

*Id.* Needless to say, Dr. Egelman does not cite anything to support these conclusory statements. *Id.*

Though purportedly "confident" in what could be accomplished with these data fields—*e.g.*, "identifying users' physical locations over time," *id.* at 4—Dr. Egelman admitted during his deposition that he does not "really know definitively what they represent," has "no idea" what some fields even mean, and does not know whether the fields "are populated for the entire dataset." Ex. B at 90:8-91:4, 103:22-104:4. In fact, Dr. Snow's extensive analysis reveals that *60 percent* of the "region" fields that Dr. Egelman claims can be used to identify TWC App users' "physical locations over time" are not populated. Ex. F (Snow Dep.) at 59:3-61:2. When confronted with this fact during his deposition, Dr. Egelman admitted he has "no basis to dispute that." Ex. B at 109:24-110:7. All Dr. Egelman really did was "pull[] out some examples of fields" where he assumed "based on the name and the value there . . . the purpose was obvious." *Id.* at 103:22-25. And Dr.

1    Egelman explained that he did not know *whether* TWC actually built the user profiles or portraits

2    he imagines, only that he thought it *could* build them based on his limited review.  *Id.* at 107:9-14

3    ("I am not making claims about what TWC does and does not do.").

4    **D.    Dr. Egelman's Opinions Regarding Localytics Do Not Respond To Either Dr. Hanssens Or Dr. Snow**

5

6    Dr. Egelman's speculative opinions about the Localytics data do not correspond to anything

7    that Dr. Snow or Dr. Hanssens said or did.  Dr. Hanssens did not mention Localytics at all.  *See* Cert

8    Opp. Ex. Q (Hanssens Rep.).  And while Dr. Snow discussed Localytics data as a source of

9    information for his event studies, those studies used the data to analyze changes in app usage and

10   location permission settings over time and in relation to three relevant events.  Cert Opp. Ex. O

11   ¶¶ 23-27.  Neither TWC's experts offered any opinions regarding the supposed ability or inability

12   of Localytics data to identify class members or build user profiles or portraits.

13   Plaintiffs' late-breaking disclosure of Dr. Egelman as an expert on Localytics is especially

14   egregious given that TWC produced that raw data to Plaintiffs *nearly a year ago* on August 10,

15   2021.  Ex. D.  Plaintiffs had months to retain an expert who could analyze the Localytics data and

16   render opinions about it ahead of the opening expert report deadline, and as discussed above Dr.

17   Egelman has been publicly linked with scrutiny of TWC's conduct since at least December 2018.

18   *Supra* § B.  If Plaintiffs wanted Dr. Egelman to serve as an expert on broader issues in the case, they

19   had ample time and opportunity to do so.

20   **E.    Dr. Egelman Fails To Disclose The Basis For His Opinions Regarding Disclosure Screens Shown In TWC App**

21   A key aspect of Dr. Egelman's opinion is the theory that TWC's experts made a mistake

22   regarding which prompts TWC showed its users at various points in time.  Ex. A at 3.  Dr. Egelman

23   claims, without citation, that the version of the iOS location prompt Dr. Hanssens examined in his

24   survey (*see* Cert Opp. Ex. Q ¶ 7) and Dr. Snow referenced solely for context (*see* Cert Opp. Ex. O

25   ¶ 12)—which is the same version of the prompt (indeed, the only version of the prompt) quoted in

26   Plaintiffs' complaint, Dkt. 73 ("FAC") ¶ 30—was only in use from November 2018 to January 2019.

27   Ex. A at 2; Ex. B at 19:14-7.  If Dr. Egelman is correct, this would mean the prompt Plaintiffs quote

28   throughout their complaint only existed for a few months of the class period.

1    However, the evidentiary record—which Dr. Egelman admittedly did not bother to review

2    (Ex. B at 109:7-17)—indicates that he is incorrect.  Krista Rouse, TWC's Head of Consumer

3    Products and 30(b)(6) designee on TWC's disclosure screens, testified that the version of the iOS

4    location prompt that appears in Dr. Snow's and Hanssens's reports was in effect for almost two

5    years during the class period, between February 2017 and January 2019.  Ex. G (Rouse. Dep.) at

6    81:12-82:3; *see also id* at 190:9-20 (confirming that the date range for the relevant location prompt

7    was February 2017 to January 2019).

8    Dr. Egelman's report does not explain the basis for his contrary assertions or identify any

9    documents or other information on which he relied.  *See* Ex. A at 3. Nor did he produce any

10   documentary support for his opinions.  Prior to his deposition, TWC requested that Dr. Egelman

11   produce any "backup showing his analysis, or any underlying data or information" used to support

12   his purported "examin[ation] of several prior versions of the iOS and Android apps," Ex. H, but

13   Plaintiffs did not respond and Dr. Egelman produced nothing.  During his deposition, Dr. Egelman

14   clarified that his conclusions were based on his own testing of historical versions of the TWC App

15   he found online.  Ex. B at 17:23-18:11.  However, Dr. Egelman could not recall where he

16   downloaded those historical versions of the App, what versions of the TWC App he tested, what

17   devices or operating system versions he tested them on, or what steps he took to cause the prompts

18   in question to be displayed.  *Id*. at 20:6-23, 21:1-22:19, 80:1-17.  Dr. Egelman was not even sure if

19   he retained either the software he tested or the devices he used; he said he had recently "purg[ed]"

20   a number of things from his devices, and thought he may have deleted the app versions he used for

21   his analysis in that process.  *Id*. at 59:16-23 ("Q.  Do you still have the prior versions of the app that

22   you downloaded?  A.  I actually need to check because I have – I had a whole bunch of prior versions,

23   that and a bunch of other apps as I was going through and purging files."), *id* at 80:14-17 ("Q.  What

24   year are the devices that you potentially used?  A.  It totally varies.  I have, like, 20 or 30 mobile

25   devices here in my office.").

26

27

28

**F.**    **Dr. Egelman's Opinions Regarding App Disclosures Undermine Plaintiffs' Position That Certain Disclosures Were "Functionally Uniform" or "Effectively Identical"**

Dr. Egelman's criticisms about the location prompt referenced in the reports of Dr. Snow and Dr. Hanssens hinges on the assertion that the language difference between iOS prompts in effect during the relevant period is so significant that the "survey's results cannot be generalized to [] other disclosures." Ex. A at 4. But Plaintiffs' motion for class certification takes the opposite position, arguing that common issues predominate because *all* the prompts used by the TWC App during the class period were "*functionally uniform*," "*substantially identical*" or "*effectively identical*." Dkt. 141 at 2, 12-13. In fact, this claim is one of the foundations for Plaintiffs' predominance arguments. *See id.* at 12 ("Here, the crucial substantive issues will be adjudicated using common proof. The claims depend on objective evaluation of TWC's uniform conduct. TWC provided *substantially identical* representations to all class members to obtain access to their location data.") (emphasis added).

Dr. Egelman doubled down on his contrary stance during his deposition, insisting that "you can't draw any conclusions about people's reactions either way to any of the other prompts without explicitly testing them." Ex. B at 64:4-7. When asked whether he agreed with Plaintiffs' argument that the three prompts in his report "are all functionally uniform," Dr. Egelman responded "No. We went over this. It's hard to form any sort of opinion whether those are equivalent to each other without actually doing rigorous, you know, studies of it." *Id.* at 66:19-67:1, 73:9-16 ("Q. Your opinion is that one cannot assume that from a consumer's perspective the prompts in effect during the relevant period were identical? A. From a consumer's perspective without evaluating that, we can't know for sure, no."). Dr. Egelman also said the prompts were "materially different" in his personal view because a user could potentially associate the word "personalized"[5] in the prompt that Drs. Snow and Hanssens studied, and which Plaintiffs quote throughout the complaint as a basis for

---

[5]    The word "personalized" appears in the phrase: "You'll get personalized local weather, alerts and forecasts." Despite the fact that the word "personalized" appears before "weather," Dr. Egelman still believed it was possible that users might associate "personalized" with targeted advertising. Ex. B at 131:23-133:7 ("By using the word 'personalization,' it's possible that some subjects associate the term 'personalization' with tailored advertising.").

1    their claims, *see, e.g.*, FAC ¶ 30, 49-50, with targeted advertising.  Ex. B at 27:3-28:3.  This, of

2    course, is inconsistent with the premise of Plaintiffs' core theory that the prompts in effect during

3    the class period *failed* to disclose TWC's use of location data for advertising.

4    **III.    LEGAL STANDARD**

5          As the party seeking class certification, Plaintiffs bear the "burden of proving admissibility"

6    of Dr. Egelman's report.  *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citations omitted

7    throughout).  The Court's "gatekeeping function" under *Daubert* applies with full force at the class

8    certification stage; if expert testimony would be inadmissible at trial, it cannot meet Plaintiffs'

9    burden under Rule 23, because the factfinder would never consider it.  *See Grodzitsky v. Am. Honda*

10   *Motor Co.*, 957 F.3d 979, 987 (9th Cir. 2020) (*Daubert*'s "gatekeeping function" applies at class

11   certification); *see also* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592-

12   93 (1993).

13         Fed. R. Civ. P. 26(a)(2)(B) requires that an expert disclose not just opinions themselves, but

14   also the "basis and reasons for them" and "the facts or data considered by the witness in forming

15   them."  Expert opinions that are conclusory and speculative should be excluded because they do not

16   permit a court to evaluate whether those opinions are the result of reliable methods and reasoning.

17   *Chamberlin v. Hartog, Baer & Hand, APC*, No. 19-cv-08243-JCS, 2022 WL 526157, at *13 (N.D.

18   Cal. Feb. 22, 2022); *Holt v. Finander*, No. 2:15-cv-05089-MSC-KS, 2021 WL 1255418, at *2–*3

19   (C.D. Cal. Feb. 9, 2021).

20         Fed. R. Civ. P. 26 also requires that expert reports be disclosed "at the time[] and in the

21   sequence that the court orders."  *Wadler v. Bio-Rad Lab'ys, Inc*., No. 15-cv-02356-JCS, 2016 WL

22   6070530, at *3 (N.D. Cal. Oct. 17, 2016).  Rule 26 permits parties to serve rebuttal reports only to

23   the extent they "'are intended solely to contradict or rebut evidence on the same subject matter

24   identified by another party' in its expert disclosures."  *In Re High-Tech Emp. Antitrust Litig.*, No.

25   11–CV–02509–LHK, 2014 WL 1351040, at *3 (N.D. Cal. Apr. 4, 2014) (quoting Fed. R. Civ. P.

26   26(a)(2)(D)(ii)).  "If a party fails to provide information or identify a witness as required by Rule

27   26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a

28   motion, at a hearing, or at a trial."  Fed. R. Civ. P. 37(c)(1).  "[T]he sanction of exclusion is automatic

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE
EGELMAN

1   and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either

2   justified or harmless." *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998).

3   **IV.   ARGUMENT**

> **A.   The Court Should Exclude Dr. Egelman's Opinions as Inherently Speculative and Unreliable Under *Daubert* and Fed. R. Evid. 702**

It is black-letter law that speculative and unreliable expert testimony should be excluded under *Daubert* and Fed. R. Evid. 702.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141, 146 (1997) (holding that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[Federal Rule of Evidence 702] assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.") (internal quotation omitted); *Utne v. Home Depot U.S.A., Inc.*, No. 16-CV-01854-RS, 2022 WL 1443338, at *2 (N.D. Cal. May 6, 2022) ("Ultimately, the purpose of the [*Daubert*] assessment is to exclude speculative or unreliable testimony to ensure accurate, unbiased decision-making by the trier of fact."); *Moreno v. Los Angeles Cnty. Sheriff's Dep't*, No. 213CV07570CASMANX, 2015 WL 4652637, at *11 (C.D. Cal. Aug. 3, 2015) ("Expert testimony is not admissible if it is speculative.").  As the proponent of his opinion, Plaintiffs bear the burden to establish that Dr. Egelman's testimony meets this standard.  *Cooper*, 510 F.3d at 942; *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002).  They fail to do so.

Dr. Egelman's report is full of speculative critiques that fall apart under scrutiny.  Dr. Egelman criticizes Dr. Snow's event studies on multiple grounds.  Ex. A at 4-6.  But he admits that he did not read Dr. Snow's full expert report, and did not even look "too closely" at the parts he did read.  Ex. B at 30:1-15.  Indeed, Dr. Egelman's primary criticism of Dr. Snow's report—that Dr. Snow purportedly "focus[d]" on the wrong permission prompt in effect *during* the class period— reveals a profound misunderstanding of Dr. Snow's opinions, which measure user behavior in response to key events, including the filing of the City Attorney action and the prompts launched immediately *after* the class period.  When confronted with the fact that the language of the prompts in effect during the class period is irrelevant to Dr. Snow's analysis, Dr. Egelman replied, "I don't know.  I guess – as I said, I didn't focus on that part closely."  *Id.* at 40:4-25.

Dr. Egelman also takes aim at Dr. Hanssens' survey for allegedly testing the wrong prompt. Ex. A at 4. But Dr. Hanssens tested the version of the prompt that Plaintiffs quoted in their complaint, and which they claim in their class certification motion is "functionally uniform," "substantially identical," or "effectively identical" to the earlier version of the prompt. FAC at 12 ¶ 49; Dkt. 141 at 2, 12-13. Plaintiffs cannot have it both ways—simultaneously claiming the prompts in effect during the class period were "functionally uniform," while proffering an expert who criticizes TWC's experts on the basis that the "uniformity" of the prompts "can't [b]e assum[ed]." Dkt. 141 at 2; Ex. B 72:24-73:8. In any event, Dr. Egelman admitted that he could easily have tested his hypothesis that the earlier version of the prompt would have been perceived differently by class members, but did not. Ex. B 138:15-22. In his own words, he offers nothing more than "speculation" on this issue. *Id.* at 27:21-28:7.

Dr. Egelman also criticizes Dr. Hanssens for improper "priming." Ex. A at 4. Yet Dr. Egelman failed to even define the term "priming" in his expert report, much less cite supporting authority that could explain how priming impacted the survey results. *Id.* at 4-6. Dr. Egelman further admits that he "do[es]n't know if and the extent to which" priming had *any* effect on those results because he did not do any testing himself. Ex. B at 142:11-19.

Dr. Egelman also makes sweeping statements about what certain data fields within the Localytics data represent and what those fields can be used to show. Ex. B at 90:8-91:4, 103:22-104:4. But when questioned about these fields during his deposition, Dr. Egelman admitted that he had not reviewed the full dataset, did not "know definitively what [the data fields] represent," does not know whether they are consistently populated throughout the dataset, and has "no idea" what some fields even mean. *Id.* Dr. Egelman relied on Plaintiffs' counsel in making certain assumptions about the data, although it is not clear whether Plaintiffs' counsel had access to the data before Dr. Egelman served his report or even has access to it today. *See id.* at 56:5-15; *supra* at 7 fn.2. Dr. Egelman certainly did not engage in his own independent analysis of the full dataset. Ex. B at 56:9-14.

Because Dr. Egelman's speculative and unreliable opinions fail to add anything to the Court's consideration of Dr. Snow's and Dr. Hanssens reports, they should be excluded. *In Re Ford*,

1  2015 WL 7571772, at *9 (excluding expert report and testimony under *Daubert* and Fed. R. Evid

2  702 where expert failed to "back up his opinions with reference to any meaningful testing, literature,

3  or comparisons" or "cite any scientific reports or evidence to corroborate his conclusions or even

4  suggest that other scientists in the community would accept them").

5    **B.    The Court Should Exclude Egelman's Opinions for Failing to Provide the**
       **"Basis and Reasons" for His Opinions in Compliance With Fed. R. Civ. P.**
6      **26(a)(2)(B)(i)**

7        Plaintiffs expect the Court to take Dr. Egelman at his word about a great number of things:

8  what he could do with Localytics data, the prompts he found through his own undocumented testing

9  using unproduced materials, and the purported issues with the reports of Drs. Hanssen and Snow.

10  *Supra* §§ II.B-E.  But Dr. Egelman fails to explain the "basis and reasons" for these opinions,

11  adequately identify the "facts or data considered" when forming them, or cite any authority that

12  supports them as required by Fed. R. Civ. P. 26(a)(2)(B).  These violations warrant exclusion of Dr.

13  Egelman's entire opinion.  Fed. R. Civ. P. 37(c)(1); *Joiner*, 522 U.S. 136 at 140, 146 (affirming

14  exclusion of expert testimony that failed to rise above "subjective belief or unsupported

15  speculation") (internal quotation omitted).

16        Dr. Egelman's failures to comply with Rule 26 are neither justified nor harmless.  Dr.

17  Egelman's refusal to explain his opinions or cite any authority for them robs the Court (and TWC)

18  of the ability to assess whether Dr. Egelman's opinions are "based on reliable methods and

19  reasoning."  *Chamberlin*, 2022 WL 526157, at *13.  Dr. Egelman may believe that his opinions

20  "should be obvious" to other experts (Ex. B at 16:22-17:2), but that does nothing to assist a court

21  (or ultimately a jury) that is tasked with weighing the reliability of his evidence.

22        To the extent Plaintiffs suggest that Dr. Egelman can merely serve an amended or

23  supplemental report with citations, such an amendment would come far too late.  The parties are

24  almost finished with class certification briefing.  Moreover, TWC has already deposed Dr. Egelman

25  and given him a chance to provide the basis for his opinions during the deposition; he was not able

26  to do so.  *Id.* at 20:6-23, 21:1-22:19, 80:1-17.  Under these circumstances, supplementation cannot

27  cure the prejudice to TWC. *Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th

28  Cir. 2009) (Rule 26 supplementation does not "create a loophole through which a party who submits

1   partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's

2   challenges to the analysis and conclusions therein, can add to them to her advantage after the court's

3   deadline for doing so has passed"; rather it "means correcting inaccuracies, or filling the interstices

4   of an incomplete report based on information that was not available at the time of the initial

5   disclosure.") (internal quotation omitted).

6          Because he has completely failed to comply with Fed. R. Civ. P. 26(a)(2)(B) in a manner

7   that prevents the Court from assessing the reliability of his opinions, Dr. Egelman's opinions should

8   be excluded.  *Chamberlin*, 2022 WL 526157, at *13 (excluding opinions where expert's report

9   "failed to disclose any explanation for his conclusions that would allow the Court. . . to determine

10   whether they were based on reliable methods and reasoning."); *Holt*, 2021 WL 1255418, at *2-3

11   (excluding expert report that failed to "bridge the analytical gap between the data and the opinion

12   proffered.").

13          **C.**     **The Court Should Exclude Dr. Egelman's Opinions As Improper Rebuttal Testimony**

14

15          Dr. Egelman's report also violates the fundamental rule that "[r]ebuttal testimony cannot be

16   used to advance new arguments or new evidence."  *Wadler*, 2016 WL 6070530, at *3; *see also*

17   *Sierra Club v. Cedar Point Oil*, 73 F.3d 546, 571 (5th Cir. 1996) (explaining that rebuttal expert

18   disclosures "are not intended to provide an extension of the deadline by which a party must deliver

19   the lion's share of its expert information."); *Montera v. Premier Nutrition Corp.,* No. 16-CV-06980-

20   RS, 2022 WL 1225031, at *10 (N.D. Cal. Apr. 26, 2022) ("a defendant's rebuttal expert is limited

21   to offering opinions rebutting and refuting the theories set forth by plaintiff's expert(s)") (internal

22   quotation omitted).  Dr. Egelman's opinions about the Localytics data, and how they can be used to

23   identify class members and create "portraits" and "profiles" in particular (Ex. A at Section 2), should

24   be excluded as wholly "outside the scope of the report [he] claims to rebut."  *Huawei Techs., Co,*

25   *Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 995 (N.D. Cal. 2018).

26          Even a cursory review of the Snow and Hanssens reports reveals that Dr. Egelman's opinions

27   about Localytics do not correspond to anything that Dr. Snow or Dr. Hanssens said or did.  Dr.

28   Hanssens did not mention Localytics at all.  *See* Cert Opp. Ex. Q.  And while Dr. Snow discussed

Localytics data as a source of information for his event studies, those studies used Localytics data only to analyze certain metrics of user behavior in response to three events. Cert Opp. Ex. O ¶¶ 23-35. Neither of TWC's experts offered any opinions regarding the supposed ability of Localytics data to identify class members or build user portraits.

Dr. Egelman does not even pretend to "rebut" the opinions actually offered by Dr. Snow. He claims that the statements in this section of his report regarding identification of class members and creation of profiles "is not opinion," but rather "a fact," and that he was merely "putting those reports [of Drs. Snow and Hanssens] in context." Ex. B at 122:4-125:14. But in the very next breath, he claims that he knows these purported "facts" "based on [his] significant expertise … and experience looking at … mobile apps and third party data recipients and how they transmit data." *Id*. at 123:15-24. Indeed, his report itself states that he is offering these purported facts "[b]ased on my experience and expertise." Ex. A at 4. When an expert offers testimony about *disputed* facts based "experience and expertise," that is expert opinion. And if it is rebuttal opinion, it must respond to the opinion contained in an affirmative report. The opinions in Section 2 of Dr. Egelman's report fail to do so.

The only discernible link between Dr. Egelman's and Dr. Snow's reports is that they both mention the Localytics data. But even so, Dr. Egelman does not focus on the conclusions regarding app usage or location permissions settings that Dr. Snow discusses in his report. Instead, Dr. Egelman points to a different set of fields within the Localytics data that he contends could be used to create the kind of "profiles" or "portraits" that Plaintiffs have alleged (again without support) TWC creates in the ordinary course of business. Ex. A at 4; Dkt. 141 at 29. These opinions are obviously intended to support Plaintiffs' case for class certification rather than rebut any opinions offered by Dr. Snow. Proving as much, Dr. Egelman does not engage with the substance of Dr. Snow's report at all—and in fact admits that he did not bother reading the whole thing because he didn't think it was "really worth the time." Ex. B at 30:7-15.

Dr. Egelman's report is classic sandbagging, and the prejudice to TWC is manifest. The deadline to disclose affirmative expert reports has long since passed. Dkt. 110. There is no justification for Plaintiffs' failure to timely disclose Dr. Egelman, especially since his report is only

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE EGELMAN

six pages and he has been publicly linked to the underlying issues for years—at least December 2018, when his name appeared in a *New York Times* article that discussed TWC's conduct. *Wilson v. Wal-Mart Stores, Inc.*, No. 2:15-CV-1791-RCJ-VCF, 2016 WL 1169456, at *3 (D. Nev. Mar. 22, 2016) (granting motion to strike improper rebuttal expert report where disclosure was late and "in light of the brevity of his report").

TWC's opportunity to depose Dr. Egelman does not affect the prejudice analysis because he could not recall even the basic details of his methodology that would have allowed TWC to challenge its reliability. Had Plaintiffs disclosed Dr. Egelman as an affirmative expert, TWC would have had the "opportunity to consider whether to retain a separate rebuttal expert or issue a rebuttal expert report" to explain why Dr. Egelman's opinions about the Localytics data are baseless and incorrect. *Great W. Air, LLC v. Cirrus Design Corp.*, 2019 WL 6529046, at *12 (D. Nev. Dec. 4, 2019) (striking untimely expert report as improper rebuttal). Depriving TWC of the "timely ability to offer a rebuttal expert" is "material and prejudicial." *Id.* The Court should not allow it. *Id.*; *Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1023 (N.D. Cal. 2012) (finding that untimely disclosure was not harmless even though party deposed the expert at issue because "[i]t is axiomatic that one of the purposes of Rule 26's disclosure requirement is to place the opposing party on notice of the expert's opinions to enable them to determine what areas to explore with the expert, as well as to determine whether to designate rebuttal experts.").

**D.    The Court Should Exclude Dr. Egelman's Opinions For Failing To Comply With Fed. R. Civ. P. 26(a)(2)(B)(ii) and Fed. R. Evid. 702(b)**

Fed. R. Civ. P. 26(a)(2)(B)(ii) and Fed. R. Evid. 702(b) require that an expert produce any "facts or data considered" in forming his opinions. The Court should exclude Dr. Egelman's opinions regarding the effective dates of TWC's disclosure screens (Ex. A at Section 2)—which are contradicted by the record evidence that Dr. Egelman admittedly did not review, Ex. B at 109:7-17—for failing to comply with these basic rules. Dr. Egelman's failure means his methods are not "adequately explained," which prevents the Court from conducting the required "assessment of whether [his] reasoning or methodology properly can be applied to the facts in issue." *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020).

1    Although the details are absent from his report, Dr. Egelman revealed at his deposition that

2  his conclusions about which disclosure screens were in effect when were based on an independent

3  analysis of old versions of the TWC App he found online.  Ex. B at 17:23-18:11.  Dr. Egelman did

4  not document any information about his testing, and has not been able to explain what steps he took

5  to ensure his results were accurate.  *Id*. at 20:6-23, 21:1-22:19, 80:1-17.  The Court cannot know

6  what devices he used, what versions of the TWC App were tested, what version of the operating

7  system those apps were installed on, what behavior he used to cause the operating system to display

8  the prompts he recorded, or even where on the internet Dr. Egelman found what he claims are

9  genuine copies of old versions of the TWC App.  *Id.*  And Dr. Egelman's deposition was little help

10  in this respect because he could not explain what he did.  Ex. B at 20:6-23, 21:1-22:19, 80:1-17.  Dr.

11  Egelman's unsupported analysis is fundamentally at odds with the undisputed testimony of TWC's

12  30(b)(6) witness on this very issue, Ex. G (Rouse Dep.) at 81:7-82:2, 190:9-20, but TWC is unable

13  to explain to the Court how Dr. Egelman came to his contrary conclusions because he provided no

14  information.

15    All the Court has to go on are three undated screenshots and Dr. Egelman's uncorroborated

16  assertions about where they came from and what they mean.  Ex. A at 2.  This does not even come

17  close to the level of information that Fed. R. Civ. P. 26(a)(2)(B)(ii) and Fed. R. Evid 702(b) require,

18  and for that reason the Court should prevent Dr. Egelman from offering any opinion or testimony

19  stemming from this analysis in this case.  *In re Silberkraus,* 336 F.3d 864, 871 (9th Cir. 2003)

20  (holding that courts may disregard an expert opinion if it "is not supported by sufficient facts to

21  validate it in the eyes of the law.");  *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994)

22  (explaining that the methods used by the expert must be described "in sufficient detail" such that

23  the district court can determine if they are reliable); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d

24  18, 22 (2d Cir. 1996) (finding trial court abused its discretion in admitting expert opinion because

25  it was not "accompanied by a sufficient factual foundation") (internal quotation omitted); *Poore-*

26  *Rando v. United States*, No. C16-5094 BHS, 2017 WL 5549580, at *3 (W.D. Wash. Nov. 17, 2017)

27  (excluding expert opinion that was "premised on inaccurate data and is disproved by facts that

28  Plaintiff[s have] failed to genuinely dispute").

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE
EGELMAN

1

2

**E.**     **If Plaintiffs Insist That TWC's Disclosures Were "Functionally Uniform," The Court Should Exclude Dr. Egelman's Contrary Opinion**

3

In order to be relevant, expert testimony must "logically advance a material aspect of the

4

party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019). The Court

5

should exclude Dr. Egelman's opinion about the relevant dates of the iOS permission prompt (Ex.

6

A at Section 2) because it is at odds with Plaintiffs' own positions in their class certification motion.

7

Even if Dr. Egelman were correct that the version of the iOS location prompt Dr. Snow

8

referenced and Dr. Hanssens studied was only in use from November 2018 to January 2019 (Ex. A

9

at 2), his criticism should still be excluded as irrelevant because Plaintiffs themselves have

10

disclaimed any material difference between prompts used by the TWC App during the class period.

11

This version of the iOS location prompt is the same (and only) prompt that Plaintiffs quoted in their

12

Complaint. FAC at 12 ¶ 49. And in their motion for class certification, Plaintiffs maintain that all

13

of the iOS and Android prompts in effect during the class period were "*functionally uniform*" or

14

"*effectively identical*." Dkt. 141 at 8, 13 (emphasis added). Indeed, Plaintiffs' commonality and

15

predominance arguments are premised on the position that "the crucial substantive issues will be

16

adjudicated using common proof" because "TWC provided substantially identical representations

17

to all class members to obtain access to their location data." *Id.* at 12.

18

If Plaintiffs are correct that all of the iOS prompts used by TWC were "functionally uniform"

19

and "effectively identical" for the purposes of their claims, then it does not matter which of the two

20

iOS prompts in effect during the class period was used by TWC's experts. Dr. Egelman's expert

21

testimony about differences in prompts—a primary criticism of both experts—will not "help the

22

trier of fact to understand the evidence or to determine a fact in issue" because Plaintiffs have

23

expressly disclaimed any argument that would make those purported differences relevant. Fed. R.

24

Evid. 702(a). "Expert testimony which does not relate to any issue in the case is not relevant and,

25

ergo, non-helpful." *Daubert*, 509 U.S. at 591. Dr. Egelman's opinions the effective dates of TWC's

26

iOS permission prompt are irrelevant and should be excluded.

27

28

1    **V.     <u>CONCLUSION</u>**

2    TWC respectfully requests that the Court exclude Dr. Egelman's report and testimony in

3    their entireties for failure to disclose either the "basis and reasons" for any of the proffered opinions

4    or the "facts or data considered" as required by Fed. R. Civ. P. 26(a)(2)(B).   In addition, TWC

5    respectfully requests that the Court exclude Dr. Egelman's opinions on the following subjects as

6    speculative and unreliable under *Daubert* and Fed. R. Evid. 702:

7         (4) Opinions regarding effective dates of certain location prompts (Ex. A at Section 2);

8         (5) Opinions regarding TWC's Localytics data (Ex. A at Section 2); and

9         (6) Opinions regarding the expert reports of Drs. Hanssens and Snow (Ex. A at Section 3).

10   TWC further requests that the Court exclude Dr. Egelman's opinions on the following subjects

11   pursuant to Fed. R. Civ. P. 37(c)(1) on the following grounds:

12        (1) Opinions regarding TWC's Localytics data (Ex. A. at Section 2) as improper rebuttal

13   evidence pursuant to Fed. R. Civ. P. 26(a)(1)(D)(ii); and

14        (2) Opinions regarding effective dates of certain location prompts (Ex. A at Section 2) for

15   failure to disclose any of the "facts or data" underlying his analysis pursuant to Fed. R. Civ. P.

16   26(a)(1)(D)(ii).

17

18   DATED:  July 28, 2022            QUINN EMANUEL URQUHART & SULLIVAN, LLP

19

20                                    By_____*/s Stephen A. Broome*_____
                                        Attorney for Defendant TWC Product and Technology LLC
21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE EGELMAN

1

## ATTESTATION

2

I, Lindsay Cooper, am the ECF User whose ID and password are being used to file this

3

document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that Stephen Broome

4

has concurred in this filing.

5

6

DATED: July 28, 2022                 QUINN EMANUEL URQUHART & SULLIVAN, LLP

7

*By:*  */s/ Lindsay Cooper*
Lindsay Cooper

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO STRIKE AND EXCLUDE THE EXPERT REPORT AND TESTIMONY OF SERGE
EGELMAN