# Exhibit B

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5    JON HART, ALEX DANIELS AND      )

      JOSHUA DUNLAP,                  )

 6                                    )

                  Plaintiffs,         )

 7                                    ) Case No.

           vs.                        ) 4:20-cv-03842

 8                                    ) JST(JSC)

      TWC PRODUCT AND TECHNOLOGY LLC, )

 9                                    )

                  Defendant.          )

10    _____)

11

12

13                   CONFIDENTIAL

14       VIDEOTAPED VIDEOCONFERENCE DEPOSITION

15              OF SERGE EGELMAN, Ph.D.

16              FRIDAY, JULY 22, 2022

17

18

19

20

21    JOB NO.:  5331337

22    (Pages 1 through 121)

      REPORTED BY TARA SANDFORD, CSR NO. 3374, RPR

23

24    (Pages 122 through 189)

25    REPORTED BY MONICE CAMPBELL, CSR NO. 14171, RMR, CRR
```

Page 1

CONFIDENTIAL

1    today?

2        A.   Correct.

3        Q.   Did you get a copy of the protective order in

4    this case?

5        A.   Probably.  I mean, I signed it, so I must have.

6    I signed it so, therefore, I certainly have saved a copy

7    of it.

8        Q.   Okay.  So you remember signing the protective

9    order?

10       A.   I believe so, yes.  Do you want me to

11   double-check?

12       Q.   No.  I'll take your word for it.  That's fine.

13   I just want to make sure you're aware of the protective

14   order and the obligations thereunder.

15            Were you asked to make any assumptions in

16   preparing your report?

17       A.   I was asked to examine the opposing reports and

18   assess them and that was it.  That's what I did.

19       Q.   Okay.  So counsel didn't ask you to make any

20   assumptions?

21       A.   Not that I recall.

22            I guess one assumption is I was given a subset

23   of the data to look at, so I didn't look at exactly the

24   same data as the -- that the Snow report used.  So I'm

25   assuming the data I was shown is consistent with the

                                                    Page 10

CONFIDENTIAL

```
 1    rest of the data, but I guess that would probably be the

 2    only assumption.

 3        Q.   What's your understanding of the alleged

 4    conduct that plaintiff contends was improper in this

 5    case?

 6        A.   That the disclosures in the app were misleading

 7    with regard to how location data would be used.

 8        Q.   And when you say the disclosures in the app,

 9    you mean the TWC app?

10        A.   Yes.

11        Q.   And are you referring to both the Android

12    disclosure and the -- well, let me back up.

13             When you say disclosure, are you referring to

14    the location access permission prompt?

15        A.   Yeah.  Specifically, I mean, the one -- there's

16    the one on iOS, but I believe there was also some text

17    on a splash screen in the Android version.  I would have

18    to go back to the screenshots in my report to -- to

19    look.

20        Q.   Okay.  And when you say the disclosures in the

21    app were misleading, you're -- and then you responded

22    that it was the -- there's the location access prompt in

23    iOS and then some text on a splash screen in the Android

24    version.

25             You understand that there is a -- like a
```

CONFIDENTIAL

1    section.

2         What documents did you review --

3         Let me put it this way:  Which documents did

4    you rely on to prepare your report?

5    A.   The -- the reports that I was responding to.

6    Beyond that, there was, you know, in terms of -- I guess

7    it depends on your definition of document.  But, I mean,

8    I looked at the other reports, and I looked at, you

9    know, some subset of the data that was considered in

10   drafting those reports.

11   Q.   Typically, these reports under the rules are

12   supposed to have a -- a section that lists documents

13   relied on.  And we just noticed that your report doesn't

14   include that.

15        You have two reports and -- so you relied on

16   Dr. Snow's report, Dr. Hanssens' report, the subset of

17   the data that you reviewed.  We will come back to that.

18        What else did you rely on?

19   A.   My expertise.  As an academic, I review upward

20   of 100 papers a year as part of the peer-review process

21   for international journals and conferences.

22        And, you know, generally in writing, you know,

23   a review as part of the peer-review process, you don't

24   necessarily include, you know, citations to every

25   reference material when the issues that you are pointing

Veritext Legal Solutions
866 299-5127

1    out are -- should be obvious to another, you know,

2    trained expert in the field.

3            Certainly, you include citations if there is

4    some, you know, you know, relevant, you know,

5    contemporary research that -- that needs to be included.

6    But in terms of, you know, bias -- why experimental

7    design is flawed, it's just, you know, usually in my day

8    job that's just not usually done in a review of a paper

9    when the issues are obvious.

10   Q.   I notice you don't include any citations to any

11   other authority in your report; correct?

12   A.   No, because, I mean, again, most of the issues

13   that I -- that I outlined, I think any other expert,

14   they should be obvious to.

15   Q.   What about to a court?

16           MR. PRICE:  Object to the form.

17           You can answer.

18           THE WITNESS:  Maybe that was a failure on my

19   part then.  I'm happy to -- I am happy to revise the

20   report with citations to all of the issues that I

21   outlined.

22           MR. BROOME:  No, thanks.

23   Q.   Okay.  Aside from the Snow report, the Hanssens

24   report, the subset data that you reviewed and articles

25   that you have reviewed, did you rely on anything else in

                                                Page 17

1    preparing your report?

2        A.   Examining the apps.  But is that considered a

3    document?  So, you know, the main thing was looking at

4    the data that was collected, looking at their

5    methodologies, and looking at what was actually shown in

6    the apps.

7        Q.   Okay.  And I think in your report you said --

8    you examined several prior versions of the iOS and

9    Android apps.

10       A.   Uh-huh.  I have screenshots of them in there, a

11   couple of the versions.

12       Q.   Where did you get those?

13       A.   I mean, these are publicly released apps.

14       Q.   The prior versions are still available online?

15       A.   Yeah, there are archives on the Internet where

16   you can download prior versions of publicly released

17   apps.  Even the iTunes store there is a way of

18   downloading prior versions.

19            But I mean, if you dispute the contents of the

20   disclosures and the versions I evaluated, I mean,

21   clearly your client has the original versions.  And they

22   can introduce, you know, different disclosures if they

23   think that I got something wrong in terms of what

24   versions showed which disclosures.

25       Q.   Would you defer to that?

CONFIDENTIAL

1      A.   What do you mean?

2      Q.   I mean, if our client did introduce different

3   versions and said, you know, this is the prompt that was

4   in effect during a certain period of time based on their

5   records, would you defer to that?

6           MR. PRICE:  Object to the form.

7           THE WITNESS:  I think if they made -- I think

8   if they made the app binaries available, you know, so

9   they could be independently tested to see what

10  disclosures were present, and if those differed from the

11  same app binaries that I was able to find and produce

12  disclosures from, then I think that would be -- that

13  would be a reasonable thing to do.

14          But, you know, clearly your client hired two

15  experts who said that this is the only disclosure that's

16  relevant during this time period, and that's empirically

17  false.

18     Q.   BY MR. BROOME:  Is it your understanding that

19  those two experts were giving their expert opinion as to

20  what --

21     A.   I don't know --

22     Q.   Or were they just making assumptions?

23     A.   I don't know how they arrived at that, but both

24  reports focus on a single disclosure and imply that

25  that's the only disclosure that's at issue and that

Page 19

1    disclosure somehow generalizes to all the disclosures

2    available during the class period.  That's what's in

3    their reports.

4         How they arrived at that, I honestly couldn't

5    tell you.  I didn't write those reports.

6    Q.   Where did you -- exactly where on the Internet

7    did you find the old versions?

8    A.   I couldn't tell you off the top of my head but,

9    you know, for -- certainly for -- there are many sites

10   for Android that do this.  There are a few for iOS and,

11   again, even the iTunes store.  There used to be a way

12   that you can use the official iTunes store to download

13   earlier versions.

14   Q.   When you say there used to be a way, when did

15   that stop, to the best of your knowledge?

16   A.   I -- I don't -- I mean, as of right now, I have

17   not, you know, done it again to download older versions

18   directly from the iTunes store, so I don't know if you

19   can still do that or not.

20        At the time that I did it, I was able to get --

21   download versions of the app directly from the iTunes

22   store so that I could then look at the historical

23   versions of the disclosures.

24   Q.   Okay.  When did you do that?

25   A.   I don't recall off the top of my head.

Page 20

1      Q.   All right.  And the versions that you

2   downloaded were not versions that were produced in this

3   case?

4      A.   Again, it didn't come directly from your

5   client, but this is software that they publicly

6   released.  And so for them to be surprised that someone

7   found software -- it seems odd that they are surprised

8   that someone found software they publicly released.

9           If they dispute the content, you know, of the

10  disclosures, then they should produce the binaries so

11  they could be evaluated to see whether the disclosures

12  that I captured were incorrect.  You know, that's

13  empirical.  Someone can answer that question.

14     Q.   Which versions did you download?

15     A.   I don't recall off the top of my head.  But I

16  went through a sequence to look at whether -- you know,

17  when the disclosures changed based on the version and

18  approximate release date.

19     Q.   And the versions that you downloaded are not

20  reflected in your report; right?

21     A.   I didn't mention all of the versions.  I just

22  mentioned that it is incorrect in the Hanssens and the

23  Snow report to say that this is the only disclosure that

24  was shown to users of this app during the time period.

25     Q.   You said you didn't mention all the versions.

1   You didn't mention any of the versions that you tested;

2   right?

3          MR. PRICE:  Object to the form.

4          THE WITNESS:  I reported time periods during

5   the class when the disclosures differed from the

6   disclosures that are reflected in both of those reports.

7      Q.   BY MR. BROOME:  But you didn't actually say in

8   your report which versions you tested; correct?

9          MR. PRICE:  Object to the form.

10         THE WITNESS:  I didn't include the version

11  number.  I included the approximate release dates when

12  certain disclosures were present.

13         Again, I'm happy to amend it with -- I can

14  amend the report with citations and version numbers, if

15  that would be helpful, but it seems a little bizarre,

16  given it's your client that produced the software, and

17  they clearly have the original copies.  And if they

18  dispute the screenshots I made, they can certainly share

19  the binaries so others could make screenshots.

20     Q.   BY MR. BROOME:  Did you review the Complaint in

21  this action?

22     A.   Yeah, I believe so.

23     Q.   Which version?

24     A.   I honestly don't remember.  As a matter of

25  course, whenever I'm contacted about one of these cases,

CONFIDENTIAL

1    location to be collected, that's -- that's why -- that's

2    something that an experiment would determine.

3        Q.  Do you believe that the prompts on the

4    left-hand side and the middle of Figure 1 are materially

5    different?

6            MR. PRICE:  Object to the form.

7            You can answer.

8            THE WITNESS:  My personal opinion, yes.  They

9    use different language.  I mean, personalization, you

10    know, might be some, as for many people, targeted

11    advertising.  That is why focusing on whether or not

12    personalization, you know, whether the message using

13    personalization was effective I think is a bit of a red

14    herring here because that seems like it's likely to

15    mislead.

16        But, again, that's a personal opinion, and

17    that's something that could be answered by real data if

18    you actually did a proper, you know, scientifically

19    rigorous study.  But that wasn't done, so it is hard to

20    draw any conclusions.

21        Q.  BY MR. BROOME:  So the middle prompt in Figure

22    1 says, "You'll get personalized local weather data

23    alerts and forecasts."

24        And your view is that a user might associate

25    the words "personalized" with "advertising"?

Veritext Legal Solutions
866 299-5127

1          MR. PRICE:  Object to the form.  Outside the

2     scope.

3          THE WITNESS:  Potentially.  I'm speculating,

4     but that's the type of hypothesis that one would test

5     with a controlled experiment.  But because a controlled

6     experiment wasn't properly done, it's just speculation

7     about what people are likely to interpret that to mean.

8     Q.   BY MR. BROOME:  What is AppCensus?

9     A.   AppCensus is a company that was spun off of my

10    research that does privacy analysis of mobile apps.

11    Q.   Are you aware of an article titled "Your App

12    Knows" -- "Apps Know Where You Were Last Night and

13    They're Not Keeping It a Secret," published in the New

14    York Times on December 10, 2018?

15    A.   Yeah.  That used -- that used some of my data.

16    I was on background.

17    Q.   Right.  You were consulted for the article?

18    A.   Yep.

19    Q.   Do you recall another article published in the

20    New York Times titled "How the Times Analyzes Location

21    Tracking Companies"?

22    A.   I think that, yes, and that talked about using

23    my data to write the article.

24    Q.   We talked earlier about how the -- there's an

25    Android prompt and then there's an iOS prompt, and you

Page 28

1    understand that the language used on those prompts is

2    different; right?

3         A.   Yes.

4         Q.   And the Android prompts, there's no purpose

5    string; right?

6         A.   (Nods head affirmatively.)

7         Q.   It just asks question, you know, basically just

8    asks permission to access location?

9         A.   Right.

10        Q.   Do you have an understanding as to whether app

11   developers during the relevant period were able to

12   modify that Android prompt?

13             MR. PRICE:   Object to the form.

14             THE WITNESS:   The prompt that is on the Android

15   is drawn by the operating system, and developers cannot

16   alter that.

17             Whereas, on iOS, developers can optionally

18   provide what's called a purpose string where it's a

19   sentence that gets included in the system drawn prompt

20   that has the developers' message about why they want

21   access to the data.

22             I studied this, I guess, about 10 years ago.  I

23   have a published paper on this, on the purpose strings

24   when Apple first introduced them.

25

1      Q.   BY MR. BROOME:  With respect to your comments

2   on Dr. Snow's report, do you have any opinions or

3   criticisms about Snow's -- Dr. Snow's report with

4   respect to the portions that relate to the Android

5   version of the app?

6           MR. PRICE:  Object to the form.

7           THE WITNESS:  I didn't read Snow's report too

8   closely because there were so many inaccuracies at the

9   beginning with regard to the iOS data collection that I

10  thought that was disqualifying enough and that it wasn't

11  really worth the time to read the rest of the report

12  because, you know, for instance, you know, he focuses

13  on, again, a single prompt and assumes -- and implies in

14  his report that's the only prompt that users saw, which

15  is not the case.

16          But worse, what's not said in the report, is

17  based on the log data, it's not clear if you can deduce

18  which prompt was shown to a user and when.  Because

19  without looking at what version of, you know, iOS and

20  what version of the app they have installed in doing his

21  analysis and whether or not a user with that unique

22  identifier has seen the prompt for the first time, it's

23  really impossible to say from just the log data that he

24  looked at what prompts users were shown and when.  And

25  therefore, it's -- the rest of the report just falls

Page 30

1    why I said, you know, most of -- you know, I focus on

2    the prompts that did change more frequently and not just

3    the Blue Screen.

4         Q.   BY MR. BROOME:   Right.   But you understand that

5    Dr. Snow's opinion is not focused on how users reacted

6    to the prompt that is at issue in this case.   He is

7    looking at how users, the entire user base changed in

8    terms of location-sharing preferences, downloads and

9    uninstalls after certain events, including the launch of

10   the January 25, 2019, prompt and the April 2019 Blue

11   Screen; right?

12            MR. PRICE:   Object to form.

13            You can answer.

14            THE WITNESS:   Yeah, I understand that.   But,

15   like, the case is not limited to what happened after

16   2019.   There were disclosures prior to 2019 that

17   prompted TWC to change the disclosures.

18        Q.   BY MR. BROOME:   But if one is looking at how

19   users change in terms of the metrics identified in

20   Dr. Snow's report after January 25, 2019, and April 24,

21   2019, it doesn't really matter which version of the

22   prior prompt was in effect during which month, does it?

23            MR. PRICE:   Object to the form.

24            THE WITNESS:   I don't know.   I guess -- as I

25   said, I didn't focus on that part closely.

 1    criticisms of his report, and you -- you said in

 2    response to one of my questions, "If you want me to

 3    amend the report with other issues, I can read this in

 4    more detail and highlight other issues.  Given that the

 5    iOS part, he's commenting on what disclosures from the

 6    pop-ups in iOS, you know, given that is factually wrong,

 7    and that's -- that it's not possible to tell which

 8    disclosures of that part of the report were shown to its

 9    users, it is hard to give much credibility to any of the

10    other findings in this report either."

11         Do you recall giving that testimony?

12    A.   Yes.

13    Q.   And so is it your opinion that there's

14    something factually wrong with the report, that the

15    whole report should be disregarded?

16         MR. PRICE:  Object to the foam.

17         You can answer.

18         THE WITNESS:  It depends on circumstances.  So

19    in this case a big part of the report is this assumption

20    you can identify which disclosures were shown to which

21    users and -- and what their reaction means.  Part of

22    that -- part of how he uses that is wrong in that, you

23    know, it's not clear that you can actually know which

24    iOS users saw which disclosures.

25         Given that, it -- that's a pretty big claim,

Page 50

1    and that's why I would be skeptical about the rest but

2    didn't really pay close attention to the rest because,

3    again, I thought that issue was so disqualifying.

4         Q.   BY MR. BROOME:  And if it turned out that

5    Dr. Snow was correct, and you were wrong regarding the

6    dates in which the prior prompt was in effect, would

7    that mean your whole report should be disregarded?

8              MR. PRICE:  Object to the form.

9              THE WITNESS:  No, because that's immaterial,

10   the specific dates.  If I'm -- if I'm wrong about what

11   users saw and -- and how to measure reaction to them,

12   and that's the main thing that my report is

13   contributing, then, yes.  But, you know, being wrong

14   about the dates isn't really a material error.  Yet

15   be -- well . . .

16        Q.   BY MR. BROOME:  Being wrong about the dates

17   isn't a material error if it's -- if we're talking about

18   your report; it is a material error if we are talking

19   about Dr. Snow's report?

20             MR. PRICE:  Object to the form.

21             THE WITNESS:  No.  What is a material error is

22   being able to say from these log files we know exactly

23   which users were shown which disclosures and what their

24   reactions to those disclosures actually mean.

25        Q.   BY MR. BROOME:  He doesn't say that?  Can

CONFIDENTIAL

```
 1    opinion.
 2             As I said, I looked at the iOS portion.  That
 3    was flawed, so I -- I didn't really pick much of the
 4    Android apart.
 5        Q.   All of the data that was provided to Dr. Snow
 6    was provided to you; correct?
 7        A.   No.
 8        Q.   Did you ask for it?
 9        A.   Yeah.  Apparently, there were some issues with
10    your folks being able to find the right password to --
11    to decrypt the data.  I was told that it is just more of
12    the same, and so it didn't seem necessary.
13        Q.   But we did decrypt the data.  Did you not get
14    access to the full dataset?
15        A.   I did not get access to the full dataset, no.
16        Q.   In Opinion 3, he writes, "On average, users of
17    the iOS app share location data with TWC at different
18    rates as compared to users of the Android app, and these
19    relative rates changed over time."
20             Do you see that?
21        A.   Okay.
22        Q.   Do you dispute that opinion?
23        A.   Again, I have no -- I have no basis to really
24    evaluate it either way without looking at the data and
25    making the same calculation.
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1        A.   No, I'm not.  I am talking about --
 2        Q.   Hold on.  Wait.  Wait.  Let me finish my
 3   question.
 4             If we just focus on the launch of these
 5   prompts, right, those --
 6             Well, let me ask you this:  Do you have any
 7   basis to dispute that the L.A. City Attorney
 8   Complaint -- filing of the L.A. City Attorney Complaint
 9   does not correspond to a material change in user
10   behavior?
11        A.   Sorry.  What?
12        Q.   In 23 Dr. Snow says -- let me go back down
13   here.  27, I think we're at, we're in subparagraph 4 --
14   strike that.
15             All right.  We will come back to this one.
16             Do you still have the prior versions of the app
17   that you downloaded?
18        A.   I actually need to check because I have -- I
19   had a whole bunch of prior versions, that and a bunch of
20   other apps as I was going through and purging files for
21   other related stuff when I came across them and realized
22   that, yeah, that I had a lot of apps, old app versions
23   sitting around from various other things.
24        Q.   Are they downloaded to your personal device
25   or --
```

1    any difference to Dr. Hanssens' results if he used that

2    prompt instead of the purpose string in the prompt in

3    the middle of Figure 1; right?

4        A.   My -- what I'm telling you is that you can't

5    draw any conclusions about people's reactions either way

6    to any of the other prompts without explicitly testing

7    them.

8              MR. BROOME:  Okay.  Let's load Tab 9, Casey.

9              (Whereupon, Exhibit 3  was marked

10              for identification by the Court Reporter

11              and attached hereto.)

12       Q.   BY MR. BROOME:  Dr. Egelman, do you have an

13    understanding of what the relevant time period is in

14    this case?

15             MR. PRICE:  Object to form.

16             You can answer.

17       Q.   BY MR. BROOME:  Or the class period?

18       A.   No, not the specifics.  No.  I mean, I gather

19    it was around 2019.  I thought it predates that, given

20    the timelines in both the other reports.  But in terms

21    of the actual specific date, I would have to go back and

22    look at the Complaint.

23             MR. ADAMS:  Dr. Egelman, you will need to

24    refresh your Exhibit Share.

25             THE WITNESS:  Oh, I'm sorry.  I didn't realize

CONFIDENTIAL

1    TWC's uniform conduct and policies impacted thousands of

2    Californians."

3            And then they write, "The inadequate

4    disclosures were functionally uniform and never gave

5    notice of the scope and depth of TWC's practices."

6            Do you see that?

7    A.    Uh-huh.  Yep.

8    Q.    And then it says, "During the relevant

9    period" --

10           If you go down a bit to line 15, it says,

11   "During the relevant period, the permission prompts for

12   iOS users stated 'Either we use your location to provide

13   you with accurate weather data and forecast' or 'you'll

14   get personalized local weather data, alerts and

15   forecasts.'"

16           If you drop down a line it says, "Android users

17   prompt said, 'Allow the weather channel to access this

18   device's location with options to deny or allow.'"

19           Do you agree those three prompts are all

20   functionally uniform?

21           MR. PRICE:  Object to the form.  Outside the

22   scope.

23           THE WITNESS:  No.  We went over this.  It's

24   hard to form any sort of opinion whether those are

25   equivalent to each other without actually doing

                                              Page 66

 1    rigorous, you know, studies of it.

 2         Q.   BY MR. BROOME:  Are you aware of any study

 3    that's been conducted to support that assertion?

 4              MR. PRICE:  Object to the form.  Outside the

 5    scope.

 6              THE WITNESS:  Which assertion?

 7         Q.   BY MR. BROOME:  The assertion that the

 8    disclosures -- the disclosure -- excuse me.  The

 9    assertion that the prompts that are described on page 2

10    of plaintiffs' class certification motion are

11    functionally uniform.

12              MR. PRICE:  Object to the form.  Outside the

13    scope.

14              THE WITNESS:  I guess I'm not sure what is

15    meant by "functionally uniform."

16         Q.   BY MR. BROOME:  Are you aware of any study or

17    survey that's been conducted to determine whether the

18    prompt language elicits different reactions from

19    different users?

20              MR. PRICE:  Object to the form.  Outside the

21    scope.

22              THE WITNESS:  As I said, my lab performed such

23    a study about a decade ago when these prompts were first

24    released.  And we found that the effects of including

25    the prompt resulted in greater compliance rates, but

                                          Page 67

1    likely to understand what I understand from these

2    messages as an expert.

3         And so if Dr. Hanssens, to the extent that he's

4    making conclusions about what consumers are going to

5    understand about these, he can't really make those

6    claims without, you know, testing that consumer

7    understanding is identical.

8    Q.   Well, when plaintiffs write, "TWC provides

9    substantially identical representations to all class

10   members to obtain access to their location data," you

11   understand they are talking -- they mean they are

12   substantially identical to consumers; right?

13        MR. PRICE:  Object to the form.  Outside the

14   scope.

15        THE WITNESS:  I -- I don't know that.

16   Q.   BY MR. BROOME:  Okay.

17   A.   I mean, as an expert I'm reading -- I can read

18   those as an expert and say that these are identical in

19   substance in that they both omit secondary data uses.

20   Q.   Okay.  Let's assume, then, that plaintiffs are

21   writing this because they are trying to convince the

22   court that consumers would all interpret these

23   disclosures to be substantially identical.

24        Is it your opinion that from a consumer's

25   perspective that the prompts in effect during the

Page 72

1   relevant period were substantially identical?

2           MR. PRICE:  Object to the form.  Outside the

3   scope.

4           THE WITNESS:  I don't agree with your premise.

5       Q.   BY MR. BROOME:  Which is what?

6       A.   You said, you know, assuming they are identical

7   to the average consumer.  And I'm saying, like, we can't

8   assume that.

9       Q.   Yeah, that's what I mean, right.  Your opinion

10  is one cannot assume that from a consumer's perspective

11  the prompts in effect during the relevant period were

12  identical?

13          MR. PRICE:  Object to the form.  Outside the

14  scope.

15          THE WITNESS:  From a consumer's perspective

16  without evaluating that, we can't know for sure, no.

17      Q.   BY MR. BROOME:  All right.  Let's go back to

18  your report, Exhibit 1.

19      A.   Yep.

20      Q.   Page 2.

21      A.   Yep.

22      Q.   Okay.  You write, "Both reports" -- I'm on the

23  second paragraph.  "Both reports focus on the disclosure

24  shown in the center of Figure 1, which tells users that,

25  if allowed, you'll get personalized local weather data,

                                              Page 73

1      Q.   I think I asked you this before, but just bear

2   with me.

3           You don't remember which device you downloaded

4   the -- the app versions to when you were testing them;

5   right?

6      A.   I mean, I have several test devices at home,

7   but I don't -- as I said, when I test the apps, I'll

8   then uninstall them on the devices and whether I keep

9   the binaries around after I do the testing totally

10   depends on the circumstances.  So I would need to check

11   whether I still have the apps.

12          But again, this seems really silly, given that

13   they are apps that were published by your client.

14      Q.   What year are the devices that you potentially

15   used?

16      A.   It totally varies.  I have, like, 20 or 30

17   mobile devices here in my office.

18      Q.   All right.

19      A.   But I mean, I don't -- I don't think anyone is

20   alleging different -- different disclosures were shown

21   based on the device beyond the platform differences.

22          But again, that's -- I mean, that seems

23   immaterial to my report in that the whole point of

24   Figure 1 is to just show that there were different

25   purpose strings throughout the class period.

1    report, I found an online viewer and just pasted a

2    screenshot, rather than just putting the raw text here.

3    But that was after verifying that the data was the same.

4         Q.   How did you verify that the data was the same?

5         A.   By looking at it.

6         Q.   How much of the data did you look at?

7         A.   I mean, what's in the screenshot here.

8    Certainly, you know, the relevant pieces.  But the --

9    I -- I don't think it would be different but, again,

10   this is -- this is empirical if you're disputing that,

11   the accuracy of the screenshot.  You know, the nice

12   thing about the uniquely identifying data that you

13   collected is that you can take one of these identifiers

14   and search your dataset and see exactly where I pulled

15   this from the dataset that you have.

16        Q.   Did you review data just for one identifier?

17        A.   I skimmed the data that was given to me, and I

18   looked at what are known as the key value pairs, so the

19   different variable names, to try to make sense of the

20   types of data that were collected.  And -- and then I

21   decided to put in a representative screenshot of the

22   data in an easier to read format.

23        Q.   How many files did you look at?

24        A.   I don't remember off the top of my head but,

25   again, you know, this is gigabytes of data, so I looked

Page 83

1          And I also don't know -- I don't know the data

2     that I wasn't shown.  I don't know where that came from

3     either.  Yeah, so I don't know what came from Localytics

4     and what came from other third parties.

5          Q.   How much time did you spend looking at the

6     Localytics data?

7          A.   Again, I don't know the sources for all the

8     data, which data came from which sources, but in terms

9     of -- even so, the data analysis, generally I would have

10    to go to my invoices to look at how much time I spent.

11         Q.   Approximately?

12         A.   As I said, my total involvement in this case, I

13    think, prior to the deposition is under 20 hours.  So,

14    obviously, it is some subset of that.

15         Q.   Okay.  When you say you don't know which data

16    came from which source, Figure 2 says the data is

17    transmitted to Localytics from the TWC app.

18         So at least that screenshot comes from

19    Localytics data that was provided to you; right?

20         A.   That's what I was told, yes.

21         Q.   And then you're saying that with respect to the

22    document cited on page 4 of your report, TWC Hart

23    000010956, you're not sure whether the data in there

24    came from Localytics or some other source?

25         A.   Correct.  I don't know where that data came

Veritext Legal Solutions
866 299-5127

1    from.  It was -- you know, it was data that was

2    consistent with this and that it had unique identifiers

3    for each of the users.  I was told it's data that came

4    from TWC, and it also had GPS coordinates in it with

5    five decimals of precision.

6            Where it came from, I don't know.  I didn't ask

7    because that didn't seem relevant.  I was told it

8    came -- it was data that the app collected, which seems

9    to be the main material issue.

10        Q.   When you put the data -- sorry.  Do you

11   remember the -- I don't know if I asked you this or not,

12   but do you remember the name of the online viewer that

13   you used?

14        A.   For which?

15        Q.   In order to review the Localytics data.

16        A.   I didn't use an online viewer to review the

17   Localytics data.  After I found a snippet of data that

18   seemed, you know, interesting for a screenshot, I then

19   pasted it into an online viewer so it would print it in

20   an easier format for the reader of the report.

21        Q.   Do you remember the name of that online viewer?

22        A.   No.  I mean, there are many of them online.

23   Again, if you are disputing the veracity of the data,

24   that is something you can easily check.

25        Q.   I am a little more concerned about the data

 1   know, my line of work generally, I'm very familiar with

 2   the data interchange formats, and it's very common to

 3   see data with these labels refer to these specific data

 4   types.

 5           But, you know, again, your client set the

 6   format.  So if you dispute specific things in here, you

 7   have the information to do that.

 8       Q.   You can't say definitively that all the fields

 9   that are reflected in Figure 2 are populated for the

10   entire dataset; correct?

11       A.   No.

12           MR. PRICE:  Object to form.

13           THE WITNESS:  No.  I actually noticed that

14   sometimes some of these fields are missing, so it's

15   not -- it's not clear why that is the case, but that

16   doesn't surprise me at all.

17       Q.   BY MR. BROOME:  Okay.  Do you see in Figure 2

18   the fourth field down is "birthdate"?

19       A.   Yep.

20       Q.   And it says 2016-07-18.

21       A.   Uh-huh.

22       Q.   It obviously doesn't reflect the user's

23   birthdate; right?

24       A.   I don't know what that does or does not

25   reflect.  Maybe it does reflect the user's birthdate.

1    Maybe it reflects the birth of the device, when the

2    device was first, you know, bought or turned on.  Maybe

3    it reflects something else entirely.  I have no idea

4    what that particular one reflects.

5        Q.   Okay.

6        A.   But your client certainly does.

7        Q.   Are there any other fields in the list -- well,

8    let me ask you this:  Is Figure 2 a complete list of all

9    fields that are in the dataset?

10       A.   No.  As I -- you know, I already said this.

11   It's -- I thought it was somewhat representative and

12   instructive, which is why I chose to make a screenshot

13   of it in particular.  But, you know, and I already said

14   some of the fields actually differed from, you know, one

15   data point, so to speak, to the next.

16            I mean, if one had the whole dataset, it would

17   be pretty easy to enumerate all of the different fields

18   in there.  And certainly -- again, your client, though,

19   created the names and defined those fields.  And so what

20   each of these fields represents shouldn't be a mystery

21   to them.

22       Q.   Are there any other fields reflected in Figure

23   2 where you're not sure or for which you're not sure

24   what they mean?

25       A.   Any, other than what?  Other than the birthdate

Page 91

1              Do you see that?

2        A.    Uh-huh.

3        Q.    Did you do this?

4        A.    I mean, I could do it if I had -- you know, if

5   I had the full dataset in front of me.  It would take a

6   little bit of time but, yes, I could write some scripts

7   to parse the data to map exactly where users were, you

8   know, over time.

9        Q.    Okay.  But you haven't attempted that at

10  this -- at this point?

11       A.    I wasn't asked to.

12       Q.    And could you do it even if the region field

13  was not populated for a substantial portion of the

14  entries?

15       A.    I think -- I guess it depends what other data

16  is in those entries.

17       Q.    Is there any other data that's in the fields,

18  in Figure 2, that would allow you to determine whether a

19  user is in any given state?

20       A.    As I said --

21             MR. PRICE:  Object to form.

22             THE WITNESS:  As I said, I don't know.  Based

23  on my experience with this, I pulled out some examples

24  of fields where the -- you know, based on the name and

25  the value there, the purpose was obvious.  But as you --

1    as you established, there are many here that I don't

2    really know definitively what they represent.  So it's

3    possible there is other data in there that could be used

4    to determine location.

5           But we also know that this data in conjunction

6    with other datasets could be used to do that, as well.

7    And also, this doesn't even consider whether the IP

8    address was captured.  So, you know, for every

9    transmission on the Internet, the recipient gets the IP

10   address of the center and so, you know, if that's saved,

11   even just in the course of standard logging, you could

12   go back and use those IP addresses to get an approximate

13   location for every user in the dataset.

14   Q.   BY MR. BROOME:  IP address is often not a

15   reliable indicator as to where somebody is actually

16   located; right?

17           MR. PRICE:  Object to form.

18           THE WITNESS:  It varies.  It varies, and it

19   really depends on the circumstances.

20           For mobile devices, it's actually pretty

21   effective.

22   Q.   BY MR. BROOME:  Did you attempt to combine the

23   Localytics data with any other data for purposes of

24   determining or confirming your assertion that the data

25   could be used to identify how many unique users were

1              Do you see that?

2        A.    Yes.

3        Q.    Okay.  What identifier -- when you say "these

4    identifiers," which identifiers are you referring to?

5        A.    So on the previous page, the user uuid, device

6    uuid, those are all unique identifiers of the user.  And

7    so, again, this is an Android device.  This appears to

8    be the Android ID, which is a unique identifier.  And

9    that's a field -- that's unique for every user's device.

10   And it's also a field that data brokers collect.

11             So when they collect other data from other

12   first and third parties, they key that data to the same

13   identifiers.  And so just from this data that the TWC

14   app sends, that's linkable to data -- data -- profile

15   data on users that are stored by other data brokers.

16       Q.    Do you know whether TWC makes any data

17   available to data brokers?

18       A.    I have no idea what happens to the data after

19   TWC receives it.

20       Q.    Okay.  So when you say you're "confident that

21   these identifiers are linkable to other persistent

22   identifiers collected previously and that user profiles

23   can be created that identify users -- identify

24   individuals' physical locations over time, their

25   routines, relations, interactions and their preferences

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

1          THE WITNESS:  Based on my significant expertise

2     in the area, I think it's -- it's a reasonable

3     assumption.  But no, only your client -- only your

4     client knows for sure what that field means.  And

5     possibly Localytics does, as well, if this is where that

6     data came from.

7          Q.   BY MR. BROOME:  Did you review Dr. Snow's

8     deposition transcript in preparing your report?

9          A.   I don't believe so.  I don't believe I saw any

10    depositions.  I don't believe -- I mean, I didn't -- in

11    preparing the report, no.  But I don't know if at any

12    time -- again, my report is based entirely on just

13    reading their reports, both of those reports.

14          Whether I saw the deposition, either before or

15    after, you know, I honestly don't -- I don't recall it.

16    But, you know, if I were told that I did -- I was sent

17    the deposition, it wouldn't surprise me.

18          Q.   In a second sentence on the top paragraph on

19    page 4 you write, "For example, this data appears to

20    readily show how many users were located in a given

21    state on a given day."

22          Do you see that?

23          A.   Yes.

24          Q.   Are you aware that Dr. Snow testified that his

25    analysis indicated that the state field or the region

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

1    field was missing, was not populated for approximately

2    60 percent?

3         A.   Again, I -- I was not shown that.  I saw a

4    subset of the data.

5         Q.   Yeah.  So you have no basis to dispute that

6    then?

7         A.   I have no basis to dispute that.

8              MR. PRICE:  Object to form.

9              THE WITNESS:  But, again, based on the previous

10   question, I think that is also kind of immaterial

11   because there is sufficient data here -- you know, there

12   seems to be sufficient data for many of the users.  And

13   also, if 60 percent of the region data was missing, it's

14   not clear whether that means for 60 percent of the users

15   or just 60 percent of the data points didn't have region

16   data.  Maybe the app sends out the region data

17   periodically and not consistently.  That would explain

18   that, but it also wouldn't -- it has no bearing on the

19   ability to map, you know, where the users of the app are

20   located.

21             I am going to fill up my water five feet away.

22   I can still hear everything.

23        Q.   BY MR. BROOME:  In the next sentence you write,

24   "The version of the TWC app that was first used by any

25   given user correlates to one of the three permission

1          I don't think he makes that assumption.  But is

2     there -- can you point me to a paragraph in his report

3     where he makes that assumption?

4          A.   That's the point of an event analysis is, you

5     know, in analyzing the behavior after the event to see

6     if the event, you know, correlated with appreciable

7     change in the behavior.  But in this case, if you don't

8     know who is exposed to the event, you can't really do

9     any sort of analysis.

10         Q.   You know that new users are very likely exposed

11    to the event, so that could be what he's analyzing;

12    right?

13         A.   Maybe; maybe not.  Because --

14         Q.   Do you know what he's analyzing?

15         A.   No.

16              MR. PRICE:  Object to form.

17              THE WITNESS:  Again, like that should have

18    been -- if he did control for all of these things, that

19    should have been put in the report.  But the report as

20    written, I don't know what he actually did.  I was just

21    asked to review his report.

22              And based on his report, these are my questions

23    about whether he did these things to correct for these,

24    you know, potentially catastrophic confounding factors.

25         Q.   BY MR. BROOME:  Well, one of the catastrophic

CONFIDENTIAL

1              THE VIDEOGRAPHER:  We're back on the record.

2     The time is 1:17 p.m.

3         BY MR. BROOME:

4         Q.   Dr. Egelman, in Section 2 of your report, which

5     is titled "background," from the last paragraph on

6     page 2 until the end of the section, you are offering

7     opinions, right?

8         A.   Let me read them.

9              No.  And there's no opinion in there.

10             The Snow's report there was data used to create

11    Snow's report.  Not all of that data was shared with me.

12    That's a factual statement.  Both of those are factual

13    statements.

14             I was told that the data -- some of the data

15    came from Localytics.  That's another factual statement.

16             And that the app originated from the TWC app.

17    That's another factual statement.  There's no opinion in

18    there.

19        Q.   I think you might have misunderstood my

20    question.

21             I said, from the last paragraph on page 2 until

22    the end of the section.

23        A.   Oh, sorry.  Okay.  So which opinion are we

24    referring to?

25        Q.   Well, you say -- for example, on page 3, you

                                              Page 122

1   say, "Based on my knowledge of the mobile app system and

2   how data is transmitted between mobile apps and remote

3   servers, this data appears to contain the following

4   information."  Right?  That's one opinion and you list

5   out the information, right?

6       A.   Yes.

7       Q.   Okay.  And then the paragraph on page 4 has

8   several other opinions about identification of users and

9   whether, you know, the data could be linked to them and

10  used to create profiles, right?

11      A.   Yes.

12      Q.   Which opinions of Dr. Snow's or Dr. Hanssens'

13  are you responding to in offering those opinions?

14          MR. PRICE:  Object to the form.

15          THE WITNESS:  I'm putting those reports in

16  context.  So that's why this section is labeled

17  "background," and, again, those aren't opinions I'm

18  offering there.  This is based on significant expertise,

19  you know, and experience looking at, you know, mobile

20  apps and third-party data recipients and how they

21  transmit data.  You know, based on that experience, this

22  is -- and, you know, given the values and the labels on

23  them presented here, you know, this is almost certainly

24  what those correspond to.

25

Page 123

CONFIDENTIAL

```
 1        BY MR. BROOME:

 2        Q.   Those are not opinions in paragraph 4?

 3             MR. PRICE:   Object to the form.

 4             THE WITNESS:   Paragraph 4?  Sorry.

 5        BY MR. BROOME:

 6        Q.   I'm sorry, page 4, first paragraph.  My

 7   mistake.

 8        A.   No, that is not opinion.  Which part of that

 9   are you alleging is an opinion?

10        Q.   Well, really I mean the whole part.  Let me

11   take the statement.  "Based on my experience and

12   expertise, I am confident that these identifiers are

13   linkable to other persistent identifiers collected

14   previously from other sources and that user profiles can

15   be created that identify individuals' physical locations

16   over time, their routines, relations, interactions and

17   their preferences and interests based on other websites

18   and mobile apps that they use."

19             Your view is that is not an opinion?

20        A.   No.  That's fact.  I mean, these are unique

21   persistent identifiers.  This is how the whole mobile

22   app ecosystem functions.  It relies on these identifiers

23   to be linkable across different data sources.

24             And so by putting, you know, the unique

25   identifier in here along side this data, that allows it
```

Page 124

CONFIDENTIAL

1   to be used for these other purposes and combined with

2   other data sources.  That's absolutely fact.

3       Q.   Do you understand that when you -- when a fact

4   is disputed and an expert is brought in to give their

5   view as to which side has got it right, that is expert

6   opinion?

7            MR. PRICE:  Object to the form.  Outside the

8   scope.

9            THE WITNESS:  I haven't heard any dispute about

10  what I've said here.  I mean, this is my area of

11  expertise, and I'm telling you that persistent device

12  identifiers allow this whole ecosystem to function and

13  this is how they're used in practice and, you know, if

14  this is data is what I'm told it is, then it could be

15  used for these other purposes.

16      BY MR. BROOME:

17      Q.   So you didn't see anything in Dr. Hanssens'

18  report or Dr. Snow's report that -- well, I mean --

19  strike that and I'll ask it again.

20           You're not responding -- in the first paragraph

21  on page 4, you're not responding to any of the opinions

22  of Dr. Snow or Dr. Hanssens', correct?

23           MR. PRICE:  Object to the form.

24      BY MR. BROOME:

25      Q.   Go ahead.

1    made a different decision based on, you know, learning

2    about the data being collected about them and how it

3    might be used.

4          So understanding what that data is and how it

5    might be use is kind of fundamental to understand his

6    report in its totality.

7    Q.   Which of Dr. Snow's opinions are you responding

8    to in the first paragraph of page 4 of your report?

9    A.   It contextualizes most of these.

10   Q.   Are you done with your answer?

11   A.   Yeah, I guess.  I mean, I don't really have

12   anything to add to that.

13   Q.   Do either Dr. Snow or Dr. Hanssens offer any

14   opinions about whether you could identify how many

15   unique users were using TWC's app in a specified state

16   or region at any given time?

17         MR. PRICE:  Object to the form.

18         THE WITNESS:  You know, I would have to reread

19   both reports but, again, as I already testified, the

20   reason I put that in there in the section labeled

21   "background" -- excuse me -- is that it's understanding

22   what data was collected and how it might be used is

23   fundamental to understanding what Hanssens and Snows did

24   in their studies and that they documented in their

25   reports.

```
 1          BY MR. BROOME:

 2          Q.   Right.  But they don't offer any opinions about

 3     whether you could identify unique users in a given state

 4     or region, right?

 5               MR. PRICE:  Object to the form.

 6               THE WITNESS:  In understanding their opinions,

 7     it's -- I think it's important to understand how they

 8     formed those opinions.

 9          BY MR. BROOME:

10          Q.   Okay.  How does that relate to the question

11     that I just asked you?

12               MR. PRICE:  Object to the form.

13               THE WITNESS:  It relates because the -- sorry.

14     What was the question again?

15          BY MR. BROOME:

16          Q.   Neither Dr. -- neither Dr. Snow nor

17     Dr. Hanssens offers any opinions about whether you can

18     identify a certain number of unique users in a given

19     state or region, right?

20          A.   Right.  What I said was in understanding how

21     they arrived at that opinion, it's important to

22     understand what they actually did.  So they document

23     data analysis that they did and, you know, a consumer

24     survey that was performed in forming those opinions.

25               And so understanding what was actually being
```

1          (Exhibit Number 4 was marked.)

2      BY MR. BROOME:

3      Q.   We're going to be working off your report, so

4  we'll be focused on Exhibit 1 for now.

5      A.   Okay.

6      Q.   You write: "The Hanssens' report features a

7  survey in which participants were shown texts that was

8  briefly used by TWC in the app.  You'll get personalized

9  local weather data alerts and forecasts."  And then you

10  write: "Disclosures in use during the majority of the

11  app's existence were not examined and, therefore, this

12  survey's results cannot be generalized to those other

13  disclosures."

14          And in that second sentence there, you're

15  saying that the survey's results with respect to testing

16  the language "You'll get personalized local weather data

17  alerts and forecasts cannot be generalized to the other

18  disclosure" meaning the -- you'll get accurate local

19  weather?

20      A.   Or any other.  I mean, it's impossible to say

21  whether people would express the same reaction to

22  different wordings.  We went over this already.

23      Q.   Okay.  And then under "Threats to Internal

24  Validity," you write:  "The disclosure shown in the

25  survey were only in use by the TWC app for a fraction of

                                        Page 131

```
 1   the class period.  Unlike other disclosures used by the
 2   app, e.g., we use your location to provide you with
 3   accurate weather data and forecasts, the disclosure
 4   chosen for the survey specifically used the word
 5   personalization."  And then you say, "The survey's
 6   earlier focus on advertising may have primed
 7   respondents."
 8          Are you connecting those two concepts there?
 9   Are you saying that the words "personalization" would
10   have primed respondents to focus on advertising?
11       A.   Potentially.  We don't know.  That's why I
12   wouldn't design the study like that.  I mean, that's the
13   issue.  By using the word "personalization," it's
14   possible that some subjects associate the term
15   "personalization" with tailored advertising.  That's not
16   a reasonable leap.
17          And so by using the word, it's possible that
18   some subjects were then thinking about advertising when
19   they wouldn't have otherwise if they had simply, you
20   know, been shown that dialogue in context and asked to
21   make a decision in that moment.
22       Q.   Okay.  Even though the word personalized
23   appears before local weather data, your opinion is that
24   people may still associate the word "personalized" with
25   advertising?
```

1              MR. PRICE:  Object to the form.

2              THE WITNESS:  I think there is a difference in

3     understanding of the terms "personalization" and

4     "personalized local weather data."  Yes, I suspect there

5     is a difference in how people would interpret those two

6     phrases but I also don't know definitively and that's

7     why it should have been evaluated.

8          BY MR. BROOME:

9          Q.   Well, you could have evaluated it, right?

10             MR. PRICE:  Object to the form.

11             THE WITNESS:  I could have but I wasn't asked

12    to, so I didn't.

13         BY MR. BROOME:

14         Q.   By the way, you say here, "The disclosure

15    chosen for the survey specifically used the word

16    'personalization'."  The disclosure actually uses the

17    word "personalized" before "local weather data."

18             There's no material difference there, right,

19    that was just a typo, I suppose?

20         A.   I think in the context of my report, that

21    was -- hang on.  It doesn't say -- sorry, where is the

22    typo.

23         Q.   Well, you -- under "3.1, Threats to Internal

24    Validity," about four lines down, you have

25    "personalization" in quotes?

                                            Page 133

1    is a difference in how people would interpret those two

2    phrases."

3              I'm wondering if you're assigning some special

4    meaning to the word "personalization" as compared to

5    "personalized."

6         A.   I think context matters.

7         Q.   So in the context that you're using it in your

8    report, which is just -- I think you're just quoting the

9    prompt.

10        A.   Yes.  My point is that either term, whether

11   it's "personalized" -- so "personalized" or

12   "personalization," that might prime people to think

13   about tailored advertising.  That's the only point I'm

14   making.  And by using advertising in the question, it

15   might be that people are associating the word

16   "personalized" or "personalization" or whatever word is

17   there.

18        Q.   Under Section 3, "Comments on Hanssens Report,"

19   in the third sentence down, you write:  "Survey results

20   are confounded because responses were likely heavily

21   impacted by priming.  Participants were asked

22   specifically about ads starting in the second question

23   of the survey.  The first question was used for

24   subterfuge and then threw out."

25              Do you see that?

1          A.    Yes.

2          Q.    But there were 10 screening questions before

3     the substantive questions, right?

4          A.    Were there?  I need to pull up the survey then.

5          Q.    All right.  Feel free to do that. You should

6     have it has Exhibit 4.

7          A.    Sure.  There was screening questions.  Okay.  I

8     don't see how that's particularly relevant to the point

9     I made in the report.

10         Q.    Well, from the -- from the survey taker's

11    perspective, it's all just one big survey, right?  It's

12    not like you did the screening questions and then now

13    you're going to do the survey?

14         A.    I don't know -- I wouldn't say that having, you

15    know, both experience conducting surveys and taking them

16    myself, that often it's pretty obvious where the

17    screening questions end and the actual survey begins.

18    So I wouldn't say that.

19         Q.    Okay.  But, I mean, do you know whether that's

20    the case with respect to this survey?

21         A.    I think it's inconsequential.

22         Q.    Okay.  I mean, you say in your report -- you

23    write that participants were specifically asked about

24    ads starting in the second question of the survey, and

25    that's not accurate, right?

1      A.   Okay.  So I was inacc -- so I was inarticulate

2    there.  The point is that this question came before any

3    of the other substantive questions in the survey.  And

4    so, you know, if this were the last question of the

5    survey, that would be a different situation because

6    participants had already answered prior questions

7    without being explicitly primed to think about

8    advertising, whereas because this was essentially the

9    first substantive question that came before the other

10   substantive questions, it tainted those results because

11   participants were told to think about advertising right

12   off the bat.

13       Q.   Well, you're speculating that users were --

14   that it tainted the results.

15       A.   That's the whole point of a confounding factor.

16   If we knew the extent to which the results were tainted,

17   we could correct for that and then it wouldn't be an

18   issue.  That's the whole point of a confounding factor,

19   is we don't know -- this is a reasonable explanation, so

20   we don't know the extent to which this impacted the

21   results, which is why the results aren't reliable.

22       Q.   In fact, you don't know whether it impacted the

23   results at all, right?

24       A.   That's the point of a confounding factor, is

25   that this is -- you know, this is a significant concern

Page 137

1    because it could impact the results in a way that we

2    wouldn't be able to know about or even measure, and

3    that's why it needs to be corrected for.

4        Q.   Right.  And you could have tested yourself

5    whether it had any impact all on Dr. Hanssens' results

6    but you weren't asked to do that, right?

7            MR. PRICE:  Object to the form.

8            THE WITNESS:  I was not asked to do that.

9        BY MR. BROOME:

10       Q.   But you easily could have tested whether what

11   you call a confounding factor had any impact on

12   Dr. Hanssens' results?

13           MR. PRICE:  Object to the form.  Outside the

14   scope.

15           THE WITNESS:  I don't think I would have been

16   able to you know, exactly determine how that confounding

17   factor -- I would not be able to determine how it

18   impacted his prior survey, which is why it's a serious

19   issue.  I could, you know, design -- create a better

20   designed study to answer the question that he was

21   supposed to answer, sure, but that's -- again, that's

22   not what I was hired to do.

23       BY MR. BROOME:

24       Q.   In the same sentence you say that users were

25   asked specifically about ads in the second question of

CONFIDENTIAL

1    think about advertising prior to answering those four

2    questions.

3         A.    Yeah.

4         Q.    So how -- before the first is -- when you say

5    those four questions, you're saying questions two,

6    three, four and five, right?  So before they get to

7    question two, they're primed to think about advertising?

8         A.    Before they put an answer to question two,

9    immediately before providing an answer to question two,

10   they're asked about advertising.

11        Q.    Okay.  Okay.  And you think that affected their

12   answers to questions four and five?

13        A.    I think there's a possibility that it did.  I

14   don't -- I mean, again, this is why it's a confounding

15   factor.  I don't know if and the extent to which it did

16   but a reasonable expert looking at this, you know, study

17   methodology would ask this question and this would not

18   be published in a reputable scientific conference

19   because this is a serious methodological error.

20        Q.    And is there authority, like research that you

21   could have cited to support that opinion?

22        A.    About why your study should be free of

23   confounding factors?

24        Q.    No.  Supporting your opinion that the use of

25   the word advertising in question two would have primed

Page 142

1    what you're asking?

2              MR. PRICE:  Object to the form.

3              THE WITNESS:  Are you saying that it would be

4    disputed among experts as to whether priming is a

5    concern when conducting experimental research?

6         BY MR. BROOME:

7         Q.   I think it would be disputed among experts

8    whether the use of the word advertising in question two

9    tainted the rest of the survey.

10             MR. PRICE:  Object to the form.

11             THE WITNESS:  I think whether it did is

12   certainly a source of speculation among experts, and

13   that's why the survey shouldn't be relied upon, because

14   that's un-- it's an unknown.  We don't know the extent

15   to which that confounded the results.

16        BY MR. BROOME:

17        Q.   So take a look at question four.

18        A.   Okay.

19        Q.   It says, "Suppose you want details about how

20   the free version of the Weather Channel App may use your

21   location data."

22             Which source, if any, will you consult?

23        A.   Okay.

24        Q.   How would the use of the word advertising in

25   question two and three taint respondents' responses to

                                            Page 144

1      Q.    Okay.  So to get -- to get a sample that is

2    representative of the class, in your view, users should

3    not have been asked about The Weather Channel app,

4    whether they use The Weather Channel app?

5           MR. PRICE:  Object to the form.

6           THE WITNESS:  I think ideally, no.  I don't

7    think a real -- I don't think that the survey should

8    have been framed around a real app because this

9    introduces a potential source of bias.

10    BY MR. BROOME:

11      Q.    Okay.  And that potential source of bias is

12    resolved in the robustness survey?

13      A.    That potential source is resolved, yes, that

14    people aren't being, you know, tested on -- that their

15    preconceived notions of The Weather Channel app aren't

16    necessarily impacting their responses.  But there are

17    issues that we've already gone over with the robustness

18    survey.

19      Q.    All right.  In the next paragraph, second --

20    third sentence, you write:  "The target population is

21    not all users who can recall both using the TWC app and

22    granting it access to their location data but instead

23    should be TWC app users who were encountering the app's

24    privacy disclosures for the first time and must make

25    them -- must use them to make decisions about their

                                             Page 156

CONFIDENTIAL

```
 1    STATE OF CALIFORNIA    )

 2                           ) SS:

 3    COUNTY OF LOS ANGELES )

 4

 5         I, Monice K. Campbell, Certified Shorthand

 6    Reporter, Certificate 14171, hereby certify:

 7         I am the deposition officer that

 8    stenographically recorded the testimony in the foregoing

 9    deposition;

10         Prior to being examined, the deponent was

11    by me first duly administered an oath;

12         The foregoing is a true record of the testimony

13    given.

14

15    Dated:  July 23, 2022

16

17

18              Monice K. Campbell, CCR No. 14171

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127