UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JON HART, et al.,

        Plaintiffs,

    v.

TWC PRODUCT AND TECHNOLOGY LLC,

        Defendant.

Case No. 20-cv-03842-JST

**ORDER DENYING MOTION FOR CLASS CERTIFICATION**

Re: ECF No. 141

Before the Court is Plaintiffs' motion for class certification. ECF No. 141. The Court will deny the motion.

## I.     BACKGROUND

### A.     Factual Background

Plaintiffs Jon Hart, Alex Daniels, and Joshua Dunlap bring this putative class action against TWC Product and Technology LLC ("TWC") based on their use of TWC's "Weather Channel App" ("App"). First Amended Class Action Complaint ("FACAC") ¶¶ 2, 8-10, ECF No. 73. Plaintiffs allege that "[u]nder the guise of providing precise and real-time weather information through a mobile weather application, . . . TWC instead tracked and collected data on its users' locations . . . in a multimillion-dollar scheme to sell that data to third parties and business partners, all without its users' knowledge." Id. ¶ 6. TWC's alleged tracking occurred "at all times, day and night, 365 days a year." Id. ¶ 5. "[U]pon opening the Weather Channel App for the first time, the [A]pp asked for user permission to access the user's 'location,'" but the App allegedly "did not inform the user that TWC would be tracking the user['s] every move or that this information w[ould] be used for any purpose other than providing the user information about the weather." Id. ¶ 30. TWC has allegedly changed its disclosures "[a]s a result of lawsuits and in an attempt to

correct its past misrepresentations and deceptions." *Id*. ¶ 4.

Plaintiffs assert claims for violation of the privacy rights contained in article I, section 1 of the California Constitution and unjust enrichment. Plaintiffs also seek a declaratory judgment.

### B. Procedural Background

On June 11, 2020, Hart filed the original complaint, which also brought claims for violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*. ECF No. 1. TWC moved to dismiss the complaint. ECF No. 18. The Court granted the motion as to the CLRA and UCL claims but denied the motion as to the remaining claims. ECF No. 45. Plaintiffs filed the operative FACAC, adding Daniels and Dunlap as plaintiffs and omitting the CLRA and UCL claims. TWC moved to dismiss the FACAC for lack of standing, ECF No. 87, but then withdrew the motion, ECF No. 103.

Plaintiffs now seek to certify a class comprising "[a]ll persons and entities who reside in California who (1) downloaded the Weather Channel App and (2) granted TWC access to the user's geolocation data before January 25, 2019." FACAC ¶ 14; *see* ECF No. 141. When filing its original opposition to the motion, TWC filed two separate motions to strike Plaintiffs' expert testimony. ECF Nos. 155, 158, 160. Plaintiffs moved to strike TWC's motions for noncompliance with Civil Local Rule 7-3(a). ECF No. 170. The Court granted Plaintiffs' motion, *sua sponte* granted page limit extensions for TWC's opposition and Plaintiffs' reply, and reset the briefing schedule. ECF No. 171. The Court granted TWC's subsequent motion for leave to file a surreply to Plaintiffs' motion for class certification, ECF No. 191, and took the motion under submission without a hearing, ECF No. 192.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1332(d)(2).

## III. LEGAL STANDARD

To certify a class, a court "must be satisfied, after a rigorous analysis," that the plaintiffs meet the requirements of Rule 23 of the Federal Rules of Civil Procedure by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651,

664-65 (9th Cir. 2022) (en banc) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs must make two showings." *Id.* at 663. First, they must satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Second, they "must show that the class fits into one of three categories" under Rule 23(b). *Olean*, 31 F.4th at 663. Plaintiffs invoke Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Thus, for example, "[i]n determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67 (emphasis in original).

## IV. DISCUSSION

### A. Admissibility of Evidence

As a preliminary matter, the parties appear to disagree on the extent to which evidence must be admissible to be considered on a motion for class certification. *Compare* ECF No. 181 at 8 *with* ECF No. 176 at 17. In that vein, TWC requests that the Court strike the reports of two of Plaintiffs' experts: Dr. Serge Egelman and Ms. Susan Thompson. ECF No. 176 at 19-25, 40-42.

"Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*,

657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147-49 (1999)). To satisfy *Daubert*, scientific evidence must be both reliable and relevant. 509 U.S. at 590-91, 597. The proponent of an expert's testimony bears the burden of proving admissibility. *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Rather than the *Daubert* "gatekeeper" standard, "a lower *Daubert* standard should be employed at this [class certification] stage of the proceedings." *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004) (quoting *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 162-63 (C.D. Cal. 2002)). "[T]he question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met." *Id.*

In *Sali v. Corona Regional Medical Center*, 909 F.3d 996, 1004 (9th Cir. 2018), the Ninth Circuit emphasized that "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification." The Ninth Circuit wrote that, just as "the proof required to establish standing varies at the complaint, summary judgment and trial phases," so too is "the 'manner and degree of evidence required' at the preliminary class certification stage . . . not the same as 'at the successive stages of litigation.'" *Id.* at 1006. Subsequently, in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc), the Ninth Circuit wrote,

> In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence. *See Tyson Foods*, 577 U.S. at 454–55, 136 S. Ct. 1036 (explaining that admissibility of evidence at certification must meet all the usual requirements of admissibility and citing to Rules 401, 403, and 702 of the Federal Rules of Evidence).

Courts have reconciled the two cases by looking to the context of the Ninth Circuit's holding in *Olean*. In *Palmer v. Cognizant Technology Solutions Corp.*, the district court noted *Olean*'s citation to *Tyson Foods*, in which the Supreme Court "reasoned that the 'permissibility' of using any type of evidence in a class action depends 'on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action.'" No. CV 17-6848-DMG (PLAx), 2022 WL 18214014, at *2 (C.D. Cal. Oct. 27, 2022) (quoting *Tyson Foods*, 577 U.S. at

455).  The district court turned to the Ninth Circuit's holding in *Sali* and wrote,

> In *Sali*, the court stated that a district court "evaluating challenged expert testimony in support of class certification [. . . ] should evaluate admissibility under the standard set forth in *Daubert*." . . . The court also stated that a trial court "may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence." . . . But the court concluded that "admissibility must not be dispositive.  Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." . . . This reasoning, which emphasizes the values of reliability and relevance rather than "evidentiary formalism," comports with the Supreme Court's reasoning in *Tyson Foods*.  For this reason, the Court does not understand the en banc panel in *Olean* to have overruled *Sali*.  This Court thus reads the Ninth Circuit's statements regarding admissibility in *Olean* in light of those earlier decisions, and emphasizes the reliability and relevance of evidence rather than the form of the evidence.

*Id.* (alteration in original) (citations omitted).  The Court agrees that *Sali* and *Olean* are reconcilable on this basis and adopts this approach.[1]  *See In re Delta Airlines, Inc.*, No. LA CV20-00786 JAK (SKx), 2023 WL 2347074, at *5 (C.D. Cal. Feb. 8, 2023).  Accordingly, TWC's objections are overruled to the extent that those objections are predicated purely on the admissibility of Plaintiffs' evidence, including the expert reports of Dr. Egelman and Ms. Thompson.[2]

### B.     Standing

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in

---

[1] The Court further agrees with the *Palmer* Court that the summary judgment context provides a persuasive analog.  At summary judgment, the focus is not on "the admissibility of the evidence's form," but rather on "the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.").

[2] In support its argument that the Court should strike Ms. Thompson's expert report and testimony, TWC relies largely on the Supreme Court's decision in *Comcast v. Behrend*, 569 U.S. 27 (2013).  *Comcast* dealt not with the admissibility of evidence but rather with the "refus[al]" of the Third Circuit "to entertain arguments against respondents' damages model that bore on" the question of whether the plaintiffs had satisfied the predominance requirement of Rule 23(b)(3).  *Id.* at 34.

fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1221 (9th Cir. 2022) (alteration in original) (quoting *Maya Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011)). "[S]tanding is 'claim- and relief-specific, such that a plaintiff must be able to establish Article III standing for each of her claims and for each form of relief sought.'" *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1064 (N.D. Cal. 2015) (quoting *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1218 (N.D. Cal. 2014)). At the class certification stage, "plaintiffs 'must show standing through evidentiary proof.'" *In re Facebook Privacy Litig.*, 192 F. Supp. 3d 1053, 1058 (N.D. Cal. 2016) (quoting *Moore v. Apple Inc.*, 309 F.R.D. 532, 539 (N.D. Cal. 2015)); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of Article III standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.").

### a. Constitutional Claim

TWC argues that Plaintiffs lack standing because "the record is devoid of evidence that TWC collected precise location data from a single Plaintiff." ECF No. 176 at 19. Plaintiffs disagree, first pointing to Daniels's and Dunlap's interrogatory responses.[3] ECF No. 141 at 12 (citing ECF Nos. 141-24 & 141-25). Daniels indicated that he downloaded the TWC app to his iPhone on October 28, 2012 and agreed to share his location with the App. ECF No. 141-24 at 2-3. Dunlap indicated that he downloaded the app to his iPhone on December 26, 2009 and agreed to share his location with the app.[4] ECF No. 141-25 at 2-3. Plaintiffs then assert that "forensic

---

[3] The Court rejects TWC's suggestion that the Court should not "credit[]" Plaintiffs' interrogatory responses because they constitute "self-serving assertions. ECF No. 154-3 at 17-18. TWC cites no authority for the argument, and it is at odds with the common law. "[D]eclarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citation omitted); *see S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (noting that "declarations oftentimes will be self-serving—and properly so, because otherwise there would be no point in a party submitting them") (internal citation, quotation, and alterations omitted).

[4] TWC appears to suggest that because Dunlap does not have standing because he indicated that he

1    images of their phones reflects that the operation by which TWC collects location data was run on

2    each of them." ECF No. 141 at 13. In support of this assertion, however, Plaintiffs rely on three

3    exhibits that Plaintiffs claim "are made up of data extracted from Plaintiffs' respective mobile

4    devices." ECF No. 142-1 ¶ 4; *see* ECF Nos. 142-4, 142-5, 142-6. Nowhere do Plaintiffs identify

5    either how the data was extracted or compiled or who performed the extraction or compilation.

6    Because the exhibits lack any indicia of reliability, the Court finds that they are unpersuasive and

7    thus insufficient to establish standing. *See Palmer*, 2022 WL 18214014, at *2; *Sali*, 909 F.3d at

8    1006 ("[T]he district court should analyze the 'persuasiveness of the evidence presented' at the

9    Rule 23 stage." (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2008))).

10            However, Plaintiffs also rely on a document containing compiled location data that TWC

11   produced. *See* ECF No. 142-3. The document contains over ten-thousand entries that over a span

12   of several years within the class period. ECF No 142-3. A map from the United States Geological

13   Survey confirms that thousands of these entries contain a longitude and latitude that corresponds

14   with a certain address, and Daniels confirmed in his deposition that one of the entries corresponds

15   to home address. *Compare* ECF No. 142-3 (data entries) *with* ECF No. 182-4 at 2 (USGS map);

16   and ECF No. 182-3 at 3 (transcript of Daniels's deposition). Unlike the exhibits discussed above,

17   this evidence bears indicia of reliability and relevance that persuades the Court that TWC collected

18   Daniels' location data. The evidence therefore suffices to demonstrate an injury to Daniels'

19   privacy rights traceable to TWC's conduct and redressable by a favorable decision. *Cf. In re Sci.*

20   *Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, F. Supp. 3d 14, 28 (D.D.C. 2014)

21   (holding that the plaintiffs lacked standing at the motion dismiss stage where "the majority of

22   Plaintiffs contend[ed] neither that their personal information ha[d] been viewed nor that their

23   information ha[d] been exposed in a way that would facilitate easy, imminent access"). The Court

24   concludes that Daniels has standing with respect to Plaintiffs' claim under the California

25   _____

26   subsequently downloaded the App to his iPhone 11 Pro, which was released on September 10,
     2019, after the period of TWC's allegedly unlawful conduct ended. ECF No. 176 at 17 (citing
27   ECF No. 155-1 ¶ 34). But Dunlap provided this response to a question asking him to identify each
     time he downloaded the App. That Dunlap subsequently downloaded the App to a different phone
28   has no bearing on the fact that he originally downloaded it to an older iPhone within the
     class period.

Constitution.

TWC's arguments to the contrary are without merit. TWC first appears to suggest that the location data it produced is insufficient to support standing. TWC argues that "although TWC eventually identified location data associated with IDs provided by Plaintiff Daniels, . . . Plaintiffs have not proven that the . . . set of IDs provided exist on his device" and "have refused to participate in a process that would allow TWC to confirm that fact." ECF No. 176 at 18. But, as discussed above, other evidence in the record demonstrates that a substantial portion of the data in the document concerns a location that coincides with Daniels' home address. And to the extent that TWC objects to the document's reliability, TWC's argument "has little weight" because the document "appears to have been produced by [TWC] from its own records during discovery." *Sarmiento v. Sealy, Inc.*, No. 18-cv-01990-JST, 2020 WL 4458915, at *9 n.9 (N.D. Cal. May 27, 2020) (collecting cases).

TWC then argues that Plaintiffs lack standing because they have failed to show that TWC's ad campaigns used Plaintiffs' data it collected. ECF No. 176 at 19. While such a showing is relevant to Plaintiffs' unjust enrichment claim, it is "technological *intrusions* on the right to privacy" rather than TWC's actions subsequent to those intrusions that give rise to Plaintiffs' injury under the California Constitution. *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273 (9th Cir. 2019).

### b.   Unjust Enrichment Claim

As discussed above, the parties' standing arguments do not distinguish between Plaintiffs' constitutional claim and unjust enrichment claim. To the extent its arguments are applicable to the unjust enrichment claim, TWC argues that Plaintiffs lack standing to bring the claim because they have failed to show that TWC's ad campaigns used Plaintiffs' data. ECF No. 176 at 19. In response, Plaintiffs argue that "TWC attempts to recast" their claims because "the source of" Daniels' injury is the "large amounts of his location data stored by TWC." ECF No. 181 at 10. But to bring a claim for unjust enrichment "as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2015). In other words, for Daniels to

1    have suffered an injury sufficient to confer Article III standing, TWC must received and retained a

2    financial benefit from his data.

3        The evidence establishes that TWC conducted advertising campaigns that utilized users'

4    location data. *See, e.g.,* ECF No. 143-6; ECF No. 143-7; ECF No. 143-8; ECF No. 154-14 at 4-8,

5    9-12; ECF No. 174-7 at 20-21; ECF No. 176-5 at 6. And while TWC argues that only a small

6    number of advertisements used precise location data, TWC does not dispute that it provided

7    several programmatic ad exchanges with access to users' data. *See* ECF No. 176 at 19; *see also*

8    ECF No. 154-14 at 5-6, 9-11; ECF No. 143-7 at 2; ECF No. 174-7 at 22. Whether TWC provided

9    the data with a lesser degree of precision than it originally featured when collected is irrelevant to

10   the question of whether TWC unjustly profited from the collected data. Accordingly, Plaintiffs

11   have shown that TWC "retain[ed] a stake in the profits garnered from" Daniels's data. *In re*

12   *Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020), *cert. denied sub nom.*,

13   *Facebook, Inc. v. Davis*, 141 S. Ct. 1684 (2021). Daniels thus has standing to bring an unjust

14   enrichment claim.

15       **C.     Rule 23(a) Requirements**

16           **1.     Numerosity**

17       Rule 23(a)(1) requires the class to be "so numerous that joinder of all parties is

18   impracticable." Fed. R. Civ. P. 23(a)(1). "A class or subclass with more than 40 members raises a

19   presumption of impracticability of joinder." *Smith v. City of Oakland*, 339 F.R.D. 131, 138 (N.D.

20   Cal. 2021) (quoting *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017)).

21   Relying on evidence in the record, Plaintiffs argue that the numerosity requirement is met because

22   there is "an approximate number of 1,516,301 affected class members in 2018 alone." ECF No.

23   141 at 13. TWC does not dispute this figure. Accordingly, Plaintiffs have satisfied the

24   numerosity requirement.

25           **2.     Commonality**

26       The commonality requirement is satisfied when a plaintiff shows that "there are questions

27   of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists when a

28   plaintiffs' claims "depend upon a common contention" of "a nature that is capable of classwide

9

resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The inquiry turns on whether "the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67 (emphasis in original); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."), *overruled on other grounds by Dukes*, 564 U.S. at 338.

Plaintiffs argue that commonality is satisfied because common questions arise from "TWC's uniform collection of location data" and "TWC's disclosures in relations to these practices and procedures." ECF No. 141 at 14. TWC argues that Dr. Egelman's deposition testimony "torpedoes" Plaintiffs' argument because the prompts that allowed TWC access to a user's location data were not uniform over time or across phone operating systems. ECF No. 176 at 22.

TWC's argument rests on a mischaracterization of Dr. Egelman's testimony.[5] As to the similarity of the prompts over time and across operating systems, Dr. Egelman testified,

> I think that they're substantially identical in that neither discloses the data is going to be used for advertising purposes. In substance they are identical in that they, you know, heavily imply, if not directly say, the data is limited to use by the app for the primary purpose of using the app, and you know, very identical that they omit the secondary purposes.

ECF No. 155-12 at 9; *see also* ECF No. 174-15 at 73 ("I can read those as an expert and say that these are identical in substance in that they both omit secondary data uses."). While TWC asserts that Dr. Egelman "opined that some class members might interpret the word 'personalized' in the

---

[5] Even if Dr. Egelman had testified that the prompts were substantively different, that alone would be insufficient to defeat commonality. As the Ninth Circuit has held, "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1022.

10

challenged [iPhone Operating System ("iOS")] prompt to convey that TWC would engage in 'tailored advertising,'" ECF No. 176 at 22, Dr. Egelman expressly testified to the contrary: "I also can't know whether 'personalized' is going to be synonymous with, you know, targeted ads." ECF No. 174-15 at 70. And to the extent that he testified that the term "personalization . . . might prime people to think about tailored advertising," ECF No. 174-15 at 136, Dr. Egelman was criticizing the methodology of a survey on which TWC extensively relies consistent with the contents of his expert report, *see id.* at 132-165; *see also* ECF No. 174-5 at 5-6.

Plaintiffs' claims raise common questions of law and fact, namely, whether TWC's data collection practices breached Plaintiffs' reasonable expectations of privacy in violation of the California Constitution and whether TWC's subsequent use of this information for advertising purposes would entitle Plaintiffs to the profits unjustly earned therefrom. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 603. Accordingly, the commonality requirement is satisfied.

### 3. Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Typicality is a 'permissive standard[]'" that "'refers to the nature of the claim . . . of the class representative, and not to the specific facts from which it arose or the relief sought.'" *Johnson v. City of Grants Pass*, 50 F.4th 787, 805 (9th Cir. 2022) (alteration in original) (first quoting *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003); and then quoting *Parsons*, 754 F.3d at 805).

TWC, relying on the same mischaracterizations of Dr. Egelman's deposition testimony discussed above, argues that "[t]he material differences between Plaintiffs' experience[s]" as iOS users "and those of Android users defeats typicality." ECF No. 176 at 23. But Dr. Egelman's testimony is to the contrary, and TWC otherwise points to no evidence in support of its argument. Plaintiffs' claims are predicated on the allegations that TWC utilized misleading permission

prompts to obtain their location data and used that data to generate advertising revenue. The claims thus "stem from the same course of conduct and pattern of alleged wrongdoing as the claims of" other putative class members, *Cottle v. Plaid Inc.*, 340 F.R.D. 356, 371 (N.D. Cal. 2021), which "assure[s] that the interest[s] of the name representative[s] aligns with the interests of the class." *In re Facebook Biometric Info. Privacy Litig.*, 236 F.R.D. 535, 543 (quoting *Hanon*, 976 F.2d at 497). And TWC has not shown that Plaintiffs would be "preoccupied with defenses unique to" them. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting *Hanon*, 976 F.2d at 508). Typicality is satisfied.

### 4. Adequacy

"To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020).

Plaintiffs assert that they and their counsel have no conflicts of interest with other class members and that counsel "ha[s] pursued this case since its inception more than two years ago, including navigating it through multiple motions, over a dozen depositions, retention of experienced and highly regarded experts, and conducting and use of significant discovery." ECF No. 141 at 18. Plaintiffs further assert that counsel "has extensive experience in class action cases" and "has sufficient resources to continue to vigorously prosecute the class's claims." *Id.* TWC does not contest Plaintiffs' assertions or otherwise challenge Plaintiffs' adequacy. The adequacy requirement is satisfied.

### D. Rule 23(b) Requirements

"Under Rule 23(b)(3), a court must find that 'the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(b)(3)). "This 'inquiry focuses on the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation.'" *Id.* (quoting *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009)). The party seeking certification must also demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 at 174 (3d ed. 2005)).

### 1. Predominance

"The predominance test of Rule 23(b)(3) is 'far more demanding' than the commonality test under Rule 23(a)(2)." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 607 (N.D. Cal. 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean*, 31 F.4th at 664 (quoting *Tyson Foods,* 577 U.S. at 453). "[T]o carry their burden of proving that a common question predominates, [plaintiffs] must show that the common question relates to a central issue in the plaintiffs' claim." *Id.* at 665. The "quintessential 'common question'" is that in which "'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Owino v. Corecivic*, 60 F.4th 437, 444 (9th Cir. 2022) (quoting *Tyson Foods*, 577 U.S. at 453 (alteration in original)). "But the rule 'does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof,' so long as one or more common questions predominate." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). The predominance inquiry requires that Plaintiffs demonstrate that common questions predominate as to each cause of action for which they seek class certification. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017).

TWC primarily argues that predominance is lacking because individualized issues pervade each of Plaintiff's claims and because Plaintiffs fail to set forth sufficient models for calculating

damages and restitution.

### a. Individualized Issues

### i. Constitutional Claim

Plaintiff argues that common evidence both defines users' reasonable expectations of privacy and determines the offensiveness of TWC's conduct. ECF No. 141 at 19-21. TWC argues that individualized inquiries are necessary to determine each user's reasonable expectation of privacy and whether TWC's conduct was highly offensive. ECF No. 176 at 35-37.

In order to establish a privacy violation under the California Constitution, "Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they *maintain* a reasonable expectation of privacy, and (3) the intrusion is 'so serious . . . as to constitute an egregious breach of the social norms' such that the breach is 'highly offensive.'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 601 (emphasis added) (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)). "The existence of a reasonable expectation of privacy, given the circumstances of each case, is a mixed question of law and fact." *Id.* The California Supreme Court has written,

> "The extent of [a privacy] interest is not independent of the circumstances." . . . Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. For example, advance notice of an impending action may serve to "limit [an] intrusion upon personal dignity and security" that would otherwise be regarded as serious. . . .

*Hill v. NCAA*, 7 Cal. 4th 1, 36 (1994) (alterations in original) (citations omitted) (first quoting *Plante v. Gonzalez,* 575 F.2d 1119, 1135 (5th Cir. 1978); and then quoting *Ingersoll v. Palmer*, 43 Cal. 3d 1321, 1346 (1987)). "[T]he presence of absence of opportunities to consent voluntarily to activities impacting privacy interests obviously affects the expectations of the participant." *Id.* In that vein, "the plaintiff must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant." *Id.* at 26. California law thus contemplates that certain factors personal to an individual may affect whether that individual maintained a reasonable expectation of privacy under the California Constitution. Accordingly,

14

courts have found individualized issues to overwhelm common issues at class certification for

such claims. *See, e.g., In re Toll Roads Litig.*, 2018 WL 4952594, at *7 (C.D. Cal. 2018) ("The

reasonable expectation of privacy of class members here would turn on a slew of potential factors

affecting their understanding of the functioning of the . . . toll roads.  How familiar were class

members with these or other toll roads?  What type of experience did class members have using

other toll roads?  Did class members receive any kind of notice about the use of their [personally

identifying information] from Defendants?  If so, what kind? And did class members continue to

use the toll roads after receiving notice?  These are just some examples of the questions that would

have to be answered for each class member.").[6]

The Court agrees with TWC that the resolution of Plaintiffs' claim under the California

Constitution turns on individualized factual questions of whether each user actually maintained

their reasonable expectation of privacy.  Those questions necessarily overwhelm the common

question of whether TWC's practices constituted a highly offensive breach of users' reasonable

expectations of privacy.  For example, Plaintiffs' own expert, Dr. Egelman, testified,

> I think I will say that a . . . portion of . . . TWC's users, because it
> was a free app, some of them probably did assume that, you know,
> data would be used for advertising purposes.  Whether they assumed
> the location data was used or that purpose, I don't know.  How many
> of them assumed that, I also don't know.  I'm sure it was a nonzero
> number but there's also probably some who didn't expect that.

ECF No. 174-15 at 184.  The common question of whether users maintained a reasonable

expectation of privacy thus necessitates an individualized factual inquiry into whether individual

users understood that their affirmative responses to the permission prompts enabled TWC to use

the location data it collected for advertising purposes in addition to strictly weather-related

---

[6] The Court acknowledges that an inquiry into the reasonable expectation of privacy under the California Constitution largely entails an assessment of objective criteria that are susceptible to generalized, class-wide proof.  Plaintiffs, for example, are correct that the scope of an individual's legally protected privacy interests are "determined by 'established social norms' derived from such sources as the 'common law' and 'statutory enactment.'"  *Hernandez*, 47 Cal. 4th at 287 (quoting *Hill*, 7 Cal. 4th at 35).  Additionally, the question of whether a Plaintiff's expectations of privacy are objectively reasonable "rests on an examination of 'customs, practices, and physical setting surrounding particular activities.'" (quoting *Hill*, 7 Cal. 4th at 35).  And whether an intrusion on that right is "highly offensive" turns on the "degree and setting of the intrusion, and the intruders motives and objectives."  *Id.*  But whether a user *maintained* that expectation turns on individual circumstances.

purposes.

Similarly, whether a user maintained a reasonable expectation of privacy also turns on whether that user "conducted himself or herself in a manner consistent with an actual expectation of privacy," which requires a determination into whether the user "manifested by his or her conduct a voluntary consent to the invasive actions of defendant." *Id.* at 26. Consistent with this principle, courts in this district have found that users of applications implied consent through their conduct when they continued to use the applications despite exposure to materials that disclosed the challenged practices. For example, in *In re Google Inc. Gmail Litigation* ("*In re Google*"), No. 13-MD-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014), the plaintiffs challenged Google's practice of scanning the contents of users' e-mails. The district court denied the plaintiffs' motion for class certification on the ground that the plaintiffs failed to satisfy the predominance requirement. *Id.* at *21. The district court concluded that "individual issues regarding consent are likely to overwhelmingly predominate common issues," because there was "a panoply of sources from which email users could have learned of Google's interceptions," including included Google's Terms of Service, Google's Privacy Policies, "various Google sources," and "various media sources." *Id.* at *16. As a result, "[a] fact-finder, in determining whether Class members impliedly consented, would have to evaluate to which of the various sources each individual user had been exposed and whether each individual 'knew about and consented to the interception' based on the sources to which she was exposed." *Id.* at *17 (quoting *Berry v. Funk*, 146 F.3d 1003, 1011 (D.C. Cir. 1998)); *see also Campbell v. Facebook Inc.*, 315 F.R.D. 250, 266 (N.D. Cal. 2016) (holding that individualized issues of implied consent predominated one of the plaintiffs' claims and noting that "[e]ven if Facebook hid its practice, as long as users heard about it from somewhere and continued to use the relevant features, that can be enough to establish implied consent").[7]

---

[7] Plaintiffs argue that these and similar cases are inapplicable because they concern statutory claims rather than constitutional claims. ECF No. 181 at 12-13. But courts in this district have consistently held that consent forecloses claims for invasion of privacy under the California Constitution. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017) (collecting cases), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). Moreover, the inquiry for privacy violations under the California Constitution clearly contemplates that consent may be implied by conduct. *See*

The record demonstrates that there is a similar "panoply of sources" from which users could have learned that TWC used their location data for advertising purposes. *In re Google*, 2014 WL 1102660, at *16. For example, it is undisputed that TWC's Privacy Policy explicitly disclosed the practices at issue, ECF No. 174-17 at 4, 8, that users could view the Privacy Policy directly in the App itself, ECF No. 174-6 at 12, 20, and that at least 189,098 Android users did, in fact, view the policy in the App, *see* ECF No. 174-8 at 7.[8] It is further undisputed that the iOS App's Privacy Settings page disclosed the practices at issue and provided users the option to disable the relevant settings. ECF No. 174-6 at 8-10, 23-24. And it is also undisputed that a number of published news articles discussed TWC's use of location data for advertising purposes. *See* ECF Nos. 155-22, 155-23, 155-24, 155-25, 155-26, 155-27. The factual questions of whether users viewed any of these materials prior to or during their use of the App and whether users who viewed these materials and continued to use the App thereafter necessitate individualized factual inquiries that necessarily predominate over common legal question of whether these users maintained a reasonable expectation of privacy.[9] Plaintiffs fail to identify any generalized, class-wide proof to the contrary. Accordingly, Plaintiffs have failed to satisfy predominance as to their claim under the California Constitution.

### ii. Unjust Enrichment Claim

Setting aside the issue of implied consent, Plaintiffs argue that predominance is satisfied

---

*Hill*, 7 Cal. 4th at 26.

[8] Plaintiffs assert that TWC's data as to the users who viewed the Privacy Policy only captures the number of users who "touched" the Policy to open it in the App, not the subset of those users who actually read the terms of the Policy that disclosed the practices at issue. ECF No. 181 at 17. But this assertion only reinforces the conclusion that an individualized factual inquiry would be necessary to determine whether a particular viewer who "touched" the Policy also viewed its disclosures of TWC's practices.

[9] It is not the case that a user who impliedly consented after a period of using the App would be deemed to have retroactively consented for their entire period of use. *Cf. Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) (Bumatay, J., concurring) ("[N]o case shows that California has adopted retroactive consent as a defense to an invasion of privacy tort."); *Javier v. Assurance IQ, LLC*, No. 20-cv-02860-JSW, 2021 WL 940319, at *3 (Mar. 9, 2021) ("[T]he Court has found no case addressing retroactive consent in the privacy context."). Rather, the question of when such a user consented through conduct is necessary to assess the extent of TWC's liability as to that user.

because "practices by which location data was obtained and monetized and the relevant 'circumstances' that render the benefit unjust were uniform." ECF No. 141 at 22. TWC argues that its data collection and advertising practices were not uniform such that that Plaintiffs' unjust enrichment claim necessitates individualized factual inquiries into whether and to what extent TWC profited from each class member's location data. ECF No. 176 at 23-25.

As a preliminary matter, the Court notes disagreement among courts in this district as to the general amenability of unjust enrichment claims to class certification. *Compare Smith v. Keurig Green Mountain, Inc.*, No. 18-cv-06690-HSG, 2020 WL 5630051, at *6 ("The majority view is that unjust enrichment claims usually are not amenable to class treatment because the claim requires evaluation of the individual circumstances of each claimant to determine whether a benefit was conferred on defendant and whether the circumstances surrounding each transaction would make it inequitable for the Defendant to fail to return the benefit to each claimant." (quoting 1 McLaughlin on Class Actions § 5:60 (11th ed.))); *with In re JUUL Labs, Inc., Mktg. Sales Pracs. and Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 997 (N.D. Cal. 2022) ("[G]enerally, 'unjust enrichment claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members." (quoting *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 568 (S.D. Cal. 2012))), *appeal filed*.

Regardless, courts have found predominance satisfied where the equitable circumstances between the defendant and each class member was the same such that the claims were resolvable by generalized, common proof on a class-wide basis. *E.g., id.* ("[E]xposure [to the defendant's omissions and misrepresentations] will be addressed on a classwide basis through plaintiffs' experts. That allegedly common exposure puts this case in a different posture than the ones on which defendants rely."); *Beck-Ellman*, 283 F.R.D. at 569 (holding predominance satisfied for unjust enrichment claim where defendant's failure to disclose defects in its heating pad uniformly affected purchasers); *Brickman v. Fitbit, Inc.*, No. 15-cv-02077-JD, 2017 WL 5569827, at *7 (N.D. Cal. Nov. 20, 2017) (holding predominance satisfied for unjust enrichment claim where the defendant's "conduct [wa]s the same as to all members of the putative class" because "it [wa]s difficult to conceive of any significant equitable differences between class members" (internal

18

quotation marks omitted)).  Conversely, courts have found predominance lacking with respect to unjust enrichment claims where individualized inquiries were necessary to determine the equitable circumstances between each class member and the defendant.  *E.g., Berger*, 741 F.3d at 1070 (holding that the plaintiff's unjust enrichment claim was "not susceptible to class treatment" because the determination of whether the defendant's receipt of funds was unjust "necessarily rest[ed] on individualized determinations about the language of the contract signed by the customer, the placement and content of any signs, and the oral representations from . . . employees relating to the" surcharge at issue); *Ono v. Head Racquet Sports USA, Inc.*, No. CV 13-4222 FMO (AGRx), 2016 WL 6647949, at *14 (C.D. Cal. Mar. 8, 2016) (holding predominance lacking where the common legal question of "whether Head's receipt of money for the Tour-Line Racquets was unjust or inequitable" "necessarily rest[ed] on individualized determinations about the exposure of the purchasers to the advertisements in question"); *see also* 1 McLaughlin on Class Actions § 5:60 n.2 (collecting cases).

Here, the record demonstrates that TWC's data collection and advertising practices were not uniform with respect to members of the proposed class.  For example, JourneyFX – a location-based advertisement targeting platform utilized by TWC – placed users into various advertising segments based their interests that it inferred from commercial points of interest visited by users. ECF No. 154-15 at 4.  Users whose devices did not generate a sufficient number of location pings would not be placed into a JourneyFX segment.  ECF No. 176-5 at 6.  Devices would not generate a sufficient number of pings if an App user rarely visited designated commercial points of interest or selected the option on the App's permission prompt that only allowed the App to collect data while the App was actively in use.  *Id.*  An individualized factual inquiry would be necessary to determine (1) whether an App user's device generated sufficient information such that JourneyFX placed the user into an advertising segment, (2) the identities of the advertising segments into which a user was placed, if any, and (3) the amount of TWC's ad revenue traceable to the user's placement within those particular segments.  And this platform is just one of several that TWC used to deliver advertisements based on a user's location.  *See, e.g.*, ECF No. 143-7 at 2; ECF No. 154-14 at 6, 9-11.

The extent to which TWC obtained a benefit from users' data thus turns on a series of questions whose answers may differ as to each user, and Plaintiffs fail to identify generalized, class-wide proof capable of providing those answers. *See Doe 1 v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009) ("The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." (emphasis in original) (quoting *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1663 (1992)). Because the equitable circumstances between each TWC and each class member vary, individualized factual questions would necessarily overwhelm the common legal question. *See Olean*, 31 F.4th at 663-64. Plaintiffs have thus failed to meet their burden to satisfy predominance as to their unjust enrichment claim.

### b. Models of Damages and Restitution

For similar reasons, Plaintiffs fail to set forth adequate damages and restitution models. In order to establish predominance for their claims, the Plaintiffs must put forward a model of damages and restitution demonstrating that each is "capable of measurement on a classwide basis." *Comcast v. Behrend*, 569 U.S. 27, 34 (2013). And "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable" to the relevant theory of liability. *Id.* at 35; *see also Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (a party seeking certification "must show a classwide method for damages calculations as a part of the assessment of whether common questions predominate over individual questions"), *rev'd and remanded on other grounds*, 139 S. Ct. 710 (2019). "Moreover, while predominance is not shown where '[q]uestions of individual damage calculations . . . inevitably overwhelm questions common to the class, . . . the 'presence of individualized damages on its own' is insufficient to defeat class certification . . . ." *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 540-41 (N.D. Cal. 2018) (citations omitted) (first quoting *Comcast*, 569 U.S. at 34; and then quoting *Just Film*, 847 F.3d at 1120).

The Ninth Circuit has emphasized that although "the need for individualized findings as to the *amount* of damages does not defeat class certification," *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (emphasis added), a plaintiff must still proffer a

common methodology for *calculating* damages or restitution.  *See, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("Medline's computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim."); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) ("Pulaski's principal method for calculating restitution employs Google's Smart Pricing ratio, which . . . set[s] advertisers' bids to the levels a rational advertiser would have bid if it had access to all of Google's data . . . ."); *see also Lambert*, 870 F.3d at 1182 (9th Cir. 2017).

The model set forth by Plaintiffs' expert, Ms. Thompson, does not achieve this goal.  By its own terms, Ms. Thompson's model applies only to Plaintiffs' unjust enrichment claim and is as follows: "(Gross Revenue from Products using user device location services) - (Costs, if any, identified) = (Unjustly Retained Benefit) Allocated to Putative Class Members."  ECF No. 141-38 at 5; *see also* ECF No. 174-43 at 3.  As discussed above, the evidence in the record demonstrates that, to the extent TWC unjustly obtained advertising revenue from users' location data, the amount necessarily varied depending on a variety of factors including frequency of use, user location, and user movement.  Ms. Thompson's restitution model fails to account for those variables in any way and thus fails to show that restitution is capable of measurement on a classwide basis.  Plaintiffs do not identify a damages model for their claim under the California Constitution, but rather state in conclusory terms in their reply brief that their restitution model doubles as a sufficient damages model.  ECF No. 25 at 27.  *See Comcast*, 569 U.S. at 36 (plaintiff must present a damages model for each theory of injury).  Plaintiffs have thus failed to satisfy their burden to set forth adequate methods of calculating damages and restitution.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is denied. The Court sets a further case management conference on May 2, 2023 at 2:00 p.m. An updated joint case management statement is due April 25, 2023.

**IT IS SO ORDERED.**

Dated: March 30, 2023



_____
JON S. TIGAR
United States District Judge